## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| MIDNIGHT MADNESS DISTILLING LLC, | : Case No. 21-11750 (MDC) |
| | : |
| Debtor. | : |
| | : |

**OBJECTION OF PNC BANK, NATIONAL ASSOCIATION AND PNC EQUIPMENT FINANCE, LLC TO DEBTOR'S MOTION FOR APPROVAL OF SALE OF ASSETS AND RELATED SALE AND BID PROCEDURES**

PNC Bank, National Association and PNC Equipment Finance, LLC (collectively the "PNC"), hereby object (the "Objection") to the Debtor's Expedited Motion for Entry of an Order Approving the Sale of Substantially all of its Assets and the approval of certain sale and bid procedures relating thereto (the "Sale Motion"). In support of its Objection, PNC respectfully avers as follows:

## I.      **INTRODUCTION**

Immediately after filing this chapter 11 case, Midnight Madness Distilling, LLC (the "Debtor") made clear its intention to liquidate its operating business as a going concern to preserve and maximize the value of its assets and business operations. Because the Debtor's business operations are losing money, the Debtor seeks approval of a sale under Section 363 of the Bankruptcy Code, rather than pursuing a sale through a plan of liquidation. The Sale Motion proposes to sell the Debtor's assets to ETOH Worldwide, LLC (the "Stalking Horse"), pursuant to an asset purchase agreement that was filed with the Sale Motion (the "Stalking Horse Bid"). The Stalking Horse Bid is subject to higher or better offers from other bidders through a bid and auction process that the Debtor proposes to occur over a short thirty-day period—with a bid

deadline of only two weeks after approval of the sale procedures and an auction and sale hearing to occur the following week.

While PNC generally supports the Debtor's efforts to liquidate its assets through bankruptcy—and agrees that the Debtor's financial distress justifies a reasonably quick sale through Section 363—it has significant concerns about the Stalking Horse Bid and the sale process.  Specifically, the Stalking Horse Bid proposes to pay $1.3 million of the consideration for the assets to the Debtor's unsecured creditors—even though the sale does not propose to pay PNC's secured claims in full.  This structure is problematic for several reasons and cannot be approved by the Court unless PNC consents to the sale (and it currently does not).

PNC is also concerned about the minimal and lacking disclosures in the Sale Motion regarding relationships and agreements between the Debtor, its affiliates, and its controlling principal on the one hand and the Stalking Horse and its affiliates on the other—disclosures that are critical to the Court's and interested parties' evaluation of the Stalking Horse Bid and the Debtor's request for certain findings under Section 363(m).  PNC has also raised questions with the Debtor regarding the accuracy of certain terms of the Stalking Horse Bid (including excluded assets that are not clearly disclosed in the agreement and an error in the agreement as to the Stalking Horse's stated agreement to pay cure amounts for the assumption and assignment of contracts), as well as concerns about the lack of clarity of the specific assets and business lines being offered for sale (as certain brands under the "Midnight Madness" umbrella are indirectly owned through non-debtor subsidiaries).

Aside from the futility of proceeding with a proposed sale to the Stalking Horse that cannot be approved, these issues are also likely to concern and confuse potential bidders.  For the auction process to be meaningful, potential bidders must have certainty as to what assets are

being offered for sale, the overbid requirements for the sale when the Stalking Horse Bid provides for a purchase price consisting of cash and the assumption of debt, and ready and complete access to pertinent information.  PNC is aware that there may be competitive bidding at the auction (based on calls it received from two potential, independent parties who expressed their interest in the sale).  It is important to address these issues now to encourage these and other potential bidders to participate for the benefit of all creditors.

## II.    **FACTUAL BACKGROUND**

1.    On June 21, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  No trustees have been appointed and no committees have been formed.

2.    On the Petition Date, the Debtor filed the Sale Motion, which proposes to sell substantially all of its assets to the Stalking Horse on the terms set forth in the Stalking Horse Bid.  Paragraph 12 of the Sale Motion outlines the pertinent terms of the Stalking Horse Bid, but clarifies that the Stalking Horse Bid itself—i.e., the Asset Purchase Agreement attached to the Sale Motion—governs in the event that there are any contradictions.

3.    As described in the Sale Motion, the Stalking Horse Bid purportedly provides for a "Purchase Price" of $1,025,000 for "all or substantially all of the Debtor's Assets free and clear of liens, claims and encumbrances (other than as otherwise expressly assumed by the APA)" and for the "[a]ssumption of the liability for the Debtor's trade debts to the extent not included in the Purchase Price."  Sale Motion ¶ 12(i) and (ii).  Section 1.05 of the Stalking Horse Bid, however, defines "Purchase Price" to be "[$1,025,000], **plus** the assumption of the Assumed Liabilities (the "**Purchase Price**.").  *See* Sale Motion, Exhibit Asset Purchase Agreement, § 1.05 (first emphasis added).

4.      The Stalking Horse Bid also provides for the assumption of certain secured debt (essentially all of the Debtor's secured debt other than its obligations to PNC[1]) and "[e]ntry into a Master Subcontract Agreement and sublease arrangement that will enable the Buyer to subcontract operations to Debtor while Buyer obtains its own licenses from the Pennsylvania Liquor Control Board."  *Id.* ¶ 12(vi).   The proposed Master Subcontract Agreement and subleases are not attached to the Sale Motion, nor are their economic terms disclosed.

5.      Schedule 1.02 to the Stalking Horse Bid lists the secured and unsecured debts that the Stalking Horse proposes to assume, including $1,368,612.90 of unsecured claims.[2]  Notably, this list of unsecured claims omits almost two dozen claims disclosed on the Debtor's Schedule E/F, which was filed on July 2, 2021, including approximately $255,000 of undisputed claims. *See* Docket No. 60.

6.      Section 6.06 of the Stalking Horse Bid requires certain bankruptcy court approvals as conditions to the Stalking Horse's obligation to close.  These required approvals are set forth in Section 8.02 of the Stalking Horse Bid and include the following: (A) an order authorizing the sale of the assets free and clear of any liens, claims or encumbrances; (B) an order authorizing and directing the Debtor to execute and deliver the closing documents described in the agreement (which would include the Master Subcontract Agreement and leases); and (C) an order directing the <u>Debtor</u> to pay all cure amounts for assigned contracts at closing. *See* Sale Motion, Exhibit Assets Purchase Agreement, §§ 6.06 and 8.02.

---

[1] PNC holds a blanket lien on substantially all of the Debtor's assets, as well as purchase money security interests on certain equipment purchased with the proceeds of PNC Equipment Finance's loans to the Debtor.  PNC also holds a second-position mortgage on the Debtor's real estate.

[2] The list of unsecured debts to be assumed by the Stalking Horse includes $37,896 owed to it, as well as $106,921 owed to its sister company AgTech VI, LLC.

7.      The Sale Motion proposes that the Stalking Horse Bid is subject to higher and better offers through a bidding and auction process to be conducted through the procedures described in detail therein.  The Debtor proposes a Bid Deadline of July 28, 2021 (only two weeks after the hearing to approve the bid procedures), with an auction and sale hearing to follow in August 3 and August 5, 2021, respectively.

## III.    ARGUMENT

### A.      PNC Is Not Adequately Protected by the Proposed Sale to the Stalking Horse.

8.      The Debtor's obligations to PNC are secured by a blanket lien on substantially all of the Debtor's assets—including all tangible assets and intangible assets such as intellectual property, trademarks, and goodwill—as well as a second-position mortgage on its real estate. While the Stalking Horse Bid proposes to assume all other secured debts, it proposes to buy the Debtor's assets free and clear of PNC's liens—with such liens attaching only to the cash consideration to be paid through the sale (i.e., $1,025,000, purportedly less any closing adjustments due to the prorations required in Section 2.04 of the Stalking Horse Bid).

9.      At the same time, the Stalking Horse proposes to "assume" more than $1.3 million in unsecured accounts payable at closing.  As noted above, these "Assumed Liabilities" are included in the definition of "Purchase Price" in the Stalking Horse Bid, are part of the sale consideration being offered, and no doubt are built into the overall value that the Stalking Horse ascribes to the going concern value of the Debtor's business (which is undoubtedly part of PNC's collateral value).  When taking into account the liabilities to be assumed by the Stalking Horse, the total consideration of the Stalking Horse Bid is approximately $2.8 million (including approximately $400,000 in senior secured debt that would be assumed).

10.    While it may be appropriate for the Stalking Horse to assume the senior secured debt on the physical assets (as a means of providing adequate protection to those secured creditors), the Stalking Horse and the Debtor propose to divert more than $1.3 million of the sale consideration to satisfy junior unsecured claims to the extreme prejudice of PNC's interests in its collateral.  With this proposed sale structure, the Stalking Horse Bid cannot proceed because it does not adequately protect PNC's interests in its collateral and there is no available cash or unencumbered assets in this case that could be used by the Debtor to otherwise adequately protect PNC's interests.

11.    As set forth in Section 363(e):

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property . . . proposed to be used, sold, or leased by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. . . .

11 U.S.C. § 363(e); *see generally In re Scimeca Foundation, Inc.*, 497 B.R. 753, 772 (Bankr. E.D. Pa. 2013) (citing *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)). PNC hereby requests adequate protection with respect to the proposed sale to the Stalking Horse and the sale process in general.

12.    Ordinarily with respect to sales of assets under Section 363, secured creditors are adequately protected by their liens attaching to the consideration paid for the assets (which is usually monetized through a cash purchase price).  *Id.*  Here, however, the Debtor proposes that PNC's liens attach only to the cash consideration to be paid by the Stalking Horse at closing—$1,025,000—even though the Stalking Horse is really offering $2.4 million for PNC's collateral after taking into account the assumption of $1.3 million of unsecured debt.

13.    While the Stalking Horse proposes to "assume" these unsecured payables, the reality is that they are past-due or current obligations that are payable immediately upon

assumption. These are not long-term debts like the secured debts that are being assumed. In discussions with PNC, the Stalking Horse and the Debtor have claimed that assumption/payment of these unsecured debts is necessary for the going concern to continue to operate post-sale. That assertion is disingenuous at best. Any experienced bankruptcy practitioner knows that it is not unusual for unsecured creditors to receive pennies on the dollar through chapter 11 reorganizations or liquidations yet continue to do business with the reorganized debtor or purchasers post-bankruptcy. Indeed, for many trade creditors, the continued opportunity to do business with the going concern for years into the future provides a substantially greater benefit than any recovery on a pre-petition claim.[3]

14.    Moreover, "in discharging [its] fiduciary objections, [the Debtor] must balance the interests of all creditors." *In re Boston Generating LLC*, 440 B.R. 302, 330 (Bankr. S.D.N.Y. 2010). While the Debtor (by accepting the Stalking Horse Bid) may prefer that the sale consideration flow to unsecured creditors, as a fiduciary it must also protect PNC's interests with respect to the proposed sale. In doing so, the Debtor cannot simply ignore the priorities set forth in the Bankruptcy Code.

15.    Section 363(e) clearly requires adequate protection for PNC's interests with respect to the sale of its collateral and there is little doubt that PNC is not adequately protected by the proposed sale to the Stalking Horse. Nor can the Debtor offer other adequate protection to PNC through either cash payments or replacement liens. The cash collateral budget filed by the Debtor shows that the Debtor will probably lose money during the budget period (i.e., there are

---

[3] This argument is also strongly undercut by the inclusion of debts owed to major national companies—such as American Express—for whom bankruptcy discharges are a cost of doing business, as well as amounts owed to itself and its affiliate. The list also includes $525,000 owed to Mike Boyer, an attorney who provided legal services to the Debtor. The Debtor previously advised PNC that Mr. Boyer agreed to provide these legal services in exchange for equity in the Debtor. That raises additional questions about the proposed assumption of this purported obligation to be paid ahead of other creditors—especially when there are trade creditors listed in the Debtor's Schedules that are not included on the list of payables to be assumed by the Stalking Horse.

no excess funds for payments to PNC other than what has already been agreed to for the Debtor's use of cash collateral). Further, any unencumbered post-petition property (i.e., post-petition receivables) will already be encumbered by the replacement liens provided to PNC for use of its pre-petition cash collateral and will be sold as part of the proposed sale.[4]

16.     Accordingly, the only way PNC can be adequately protected with respect to the proposed sale to the Stalking Horse is if the Court requires that the consideration the Stalking Horse proposes to pay to unsecured creditors be part of the cash proceeds from the sale with PNC's liens attaching to such proceeds.[5] PNC understands that this would require the Stalking Horse to modify the Stalking Horse Bid in a manner that it may not agree with. However, if the Stalking Horse wants the protections of a sale under Section 363, the sale must comply with all requirements of the statute. If the Stalking Horse is not willing to proceed with an offer that adequately protects PNC's interests, there may be other interested bidders who could become the stalking horse or the Debtor could proceed without one.

**B.     As Proposed, the Stalking Horse Bid Cannot Be Approved Free and Clear of PNC's Liens.**

17.     As noted above, the Stalking Horse Bid requires an order from this Court approving the sale free and clear of all liens, claims and encumbrances under Section 363(f) as a condition precedent to the Stalking Horse's obligation to close. PNC does not believe that any of the requirements of Section 363(f) can be met with respect to the Stalking Horse Bid and, therefore it would be fruitless to proceed with a Stalking Horse Bid that is unlikely to close.

---

[4] And even if there was a small amount of excess cash or unencumbered assets, it is unlikely that could make up the $1.3 million of sale consideration that is being diverted to unsecured creditors.

[5] The Debtor cannot reasonably argue that PNC is adequately protected by the proposed auction and the fact that the Stalking Horse Bid is subject to higher and better bids. At least one bidder has informed PNC that it is reluctant to participate in the sale if the Stalking Horse Bid proceeds because it does not comply with the Bankruptcy Code (in that it diverts sale consideration to unsecured creditors in violation of statutory priorities) and causes confusion as to what would constitute a higher or better bid. Moreover, allowing the Stalking Horse Bid to proceed as proposed would simply invite other bidders to propose similar sale structures that would prejudice PNC's interests.

18.    With respect to the requirements of Section 363(f), the Sale Motion says very little and no doubt assumed that PNC would consent to the sale.  The Sale Motion states that "the Debtor believes that Section 363(f)(2) of the Bankruptcy Code will be met, because the Debtor's pre-petition secured lenders are secured by, among other things, any liens on the assets, which will instead attach to the proceeds to be paid at closing of the sale."  Sale Motion ¶ 34.  Section 363(f)(2), however, is satisfied by consent.  To be clear: PNC does not and will not consent to a proposed sale of its collateral that diverts up to $1.3 million of the purchase price to unsecured creditors (potentially paying those creditors in full) while proposing to pay PNC only 40% of its secured claims.

19.    While the attachment of liens to the sale proceeds has little to do with Section 363(f)(2), the proposed attachment of PNC's liens to the limited cash "proceeds" does little to protect its interests and is not sufficient for a sale free and clear under Section 363(f).  While the Debtor does not specify which subsection of Section 363(f) it believes would allow such a sale to be approved free and clear of PNC's liens (likely because it assumed that PNC would consent to this sale or otherwise negotiate a resolution with the Stalking Horse), it reserves its rights to "demonstrate that the other provisions of Section 363(f) have been satisfied" "[i]n the event of an objection from a secured creditor".  *Id.*

20.    None of the subsections of Section 363(f) would allow a sale of assets free and clear of PNC's lien where a substantial part of the consideration being paid for the assets would flow (without PNC's consent) to junior creditors.  The Stalking Horse and the Debtor attempt to draft around this by contending for purposes of the Sale Motion that the "Purchase Price" being paid for the assets is simply the $1,025,000 in cash to be paid at closing.  That argument not only defies logic, but is contradicted by the definition of "Purchase Price" in Section 1.05 of the

Stalking Horse Bid (which very clearly defines the "Purchase Price" to include both the $1,025,000 in cash proceeds **plus** the Assumed Liabilities, including the unsecured debt). It is also contradicted by Section 1.06 of the Stalking Horse Bid, which provides that the total consideration being paid (including the Assumed Liabilities) will be allocated among the Purchased Assets for tax purposes in accordance with an undisclosed "Allocation Schedule".

21.     There can be no doubt that the total consideration offered through the Stalking Horse Bid is attributable to the value of the assets being sold and the goodwill of the business enterprise (all of which are PNC's collateral with the exception of certain titled vehicles that are subject to other equipment liens). The value of those assets, therefore, is substantially greater than the $1,025,000 in cash sale proceeds being offered through the sale.[6] While Section 363(f) may, in certain circumstances, allow a forced sale of a lender's collateral free and clear of its liens (with those liens attaching to the sale proceeds), the sale structure proposed by the Stalking Horse and the Debtor is clearly problematic.

22.     The value of PNC's collateral will ultimately be set by the results of the auction— with the Stalking Horse Bid purportedly setting the floor of such value. While the Stalking Horse can fairly assume the first-position mortgage on the Debtor's real estate and the senior liens against its titled vehicles (because those liens have priority over PNC's liens), the proposed payment of the unsecured debt would allow a substantial portion of PNC's collateral value to be

---

[6] This is no surprise since the Debtor's Schedule A/B values the physical assets being sold at about $2.7 million. There are also significant intangible assets that are ascribed an unknown value. While the Debtor's valuation of the physical assets includes a mix of appraised and replacement values for specific assets, there is no doubt that this going concern has substantial value above the $1,025,000 cash proceeds offered by the Stalking Horse. Indeed, the two components of the Stalking Horse Bid—the cash proceeds and the liabilities proposed to be assumed—are likely a good indicator of the floor of the Debtor's going concern value as they tell you what value the Stalking Horse puts on the business. *See, e.g., In re On-Site Staffing, Inc.*, 412 B.R. 817, 827 (Bankr. E.D. Va. 2009) ("Fair market value of an asset is the value at which a willing buyer is willing to pay and a willing seller is willing to sell where neither the purchaser nor the seller are under any compulsion to buy or sell."). Even if the Stalking Horse believes it can negotiate discounted payments to some of the unsecured creditors, the sale consideration would be substantially more than $1,025,000.

recovered not by PNC but by junior creditors.  Under such circumstances, the Stalking Horse Bid cannot be approved free and clear of PNC's liens.

### C.    The Proposed Sale to the Stalking Horse Cannot Otherwise Be Approved.

23.    While PNC believes that Sections 363(e) and (f) prevent the Debtor from proceeding with Stalking Horse Bid, the Stalking Horse Bid otherwise cannot be approved through a Section 363 sale because it proposes to make payments to unsecured creditors without satisfying PNC's senior secured claims.  While PNC agrees with the Debtor's assertions that a Section 363 sale is necessary here due to the Debtor's unprofitable business operations, the Debtor cannot pursue a sale structure that deprives PNC of the protections of the plan confirmation process.  *See, e.g.*, *In re Boston Generating LLC*, 440 B.R. 302, 331 (Bankr. S.D.N.Y. 2010) (recognizing that "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan 'sub rosa' in connection with a sale of assets") (finding no sub rosa plan where most of the proceeds of the sale would be distributed to senior lenders in accordance with their lien priority with remaining consideration to be distributed under a plan).

24.    There is no doubt that payment of unsecured claims ahead of PNC's secured claims (and without allowing PNC to share pro rata with respect to any deficiency claim) would violate the absolute priority rule and other requirements of Section 1129(b) and could not be approved through a chapter 11 plan without PNC's consent.  In *In re On-Site Sourcing, Inc.*, 412 B.R. 817, 827-28 (Bankr. E.D. Va. 2009), the Court explained why direct payments or "gifts" to unsecured creditors through a Section 363 sale that distort the priorities of the Bankruptcy Code are not permissible:

> [Section] 1129(a)(9) requires that all administrative claims be paid
> in full unless the holder of a particular claim has agreed to a

different treatment.  The consideration earmarked for the general unsecured creditors trust effectively evades this requirement by redirecting part of the purchase price from the administrative expense claimants to general unsecured creditors without the consent of the holders of the administrative claim.

* * *

The end result of the proposed consideration for the general unsecured creditors trust would have been to divert a part of the proceeds of the sale of the debtor's assets to the general unsecured creditors to the detriment of administrative expense and priority creditors and **thereby allow the general unsecured creditors to avoid some of the vicissitudes of the chapter 11 process or a conversion to chapter 7.  All of this violates the protections chapter 11 seeks to provide for creditors** . . . .

25.     Similarly, here the Debtor and the Stalking Horse are proposing to divert a substantial portion of the purchase price for the assets to satisfy unsecured claims (through assumption and direct payment by the Stalking Horse), rather than adhering to the priorities in the Bankruptcy Code, which require PNC—as a secured creditor—to be paid first.  Allowing this sale to proceed would gut the protections of the chapter 11 confirmation process that are designed to protect PNC's interests (and those of all creditors).  That is not a permitted use of Section 363.

**D.     Certain Errors, Inaccuracies, and Ambiguities in the Sale Motion and Stalking Horse Bid Need to be Addressed.**

26.     There are several errors, inaccuracies and ambiguities in the Sale Motion and Stalking Horse Bid that need to be addressed immediately so that parties-in-interest and potential bidders understand the process, what the Stalking Horse is proposing, and what will constitute a higher and better bid if the Stalking Horse Bid is allowed to proceed as proposed.  PNC raised most of these issues with the Debtor and/or the Stalking Horse in the early weeks of this case.  That they have not yet been corrected raises questions as to whether the proposed bid deadline of July 28 is reasonable.

**1. Greater clarity is needed regarding the scope of assets being offered for sale.**

27.     The organizational structure of the Debtor makes it unclear what assets are actually being offered for sale.  While the majority of the physical assets relating to the Debtor's business operations are owned by the Debtor, the Debtor owns equity in certain subsidiaries that in turn own certain liquor brands that are sold under the "Midnight Madness" umbrella.  These various brands are listed on the Debtor's website and interested purchasers should reasonably assume that all of these brands are part of the sale (whether they are owned directly or indirectly by the Debtor).  However, based on the Debtor's Schedules it is not entirely clear whether the entire business operation is up for sale.  This is important as potential bidders may be interested in purchasing the entire "Midnight Madness" operation and omission of any assets might impact their participation.

28.     All of these brands are manufactured through the Debtor's business operations (from the same business location) and make up a consolidated financial enterprise.  PNC has also been advised that the revenue from the subsidiaries will flow through the Debtor's bankruptcy estate given the consolidated business operations.

29.     PNC wants to be sure that the value of the Debtor's business operations—including any assets indirectly owned through subsidiaries—is maximized and included in the sale, as such a broad sale is in the best interests of the Debtor's bankruptcy estate and its creditors.  The wording of the Stalking Horse Bid—which only references assets owned by the "Seller" (i.e., the Debtor)—does not clarify the scope of the assets being offered for sale, nor apparently do the materials supplied to interested bidders in the data room.[7]  Interested bidders

---

[7] To understand what information is being provided to potential bidders, undersigned counsel requested access to the data room set up by Comly and the Debtor.  The Debtor's counsel questioned PNC's right to access such information for general purposes in this case (which is surprising since PNC is designated as a Consulting Party in

are entitled to understand what exactly is being offered for sale: is it the entire "Midnight Madness" enterprise or is it something less?  If it is something less, that raises additional questions that need to be addressed by the Debtor.

**2. Greater clarity is needed regarding the required overbid and what will constitute a higher and better offer given the structure of the Stalking Horse Bid.**

30.    While PNC believes that the Stalking Horse Bid cannot proceed as proposed, if the Court determines that the sale process can continue with the Stalking Horse Bid (without requiring any modifications thereto), the Bid Procedures must provide clarity as to the overbid requirements for the sale.

31.    It is not clear whether interested bidders must overbid the entire consideration for the Stalking Horse Bid or just the cash component of that bid.  It is also not clear what would be considered a "higher or better" bid given the structure of the Stalking Horse Bid.  These issues must be resolved and clearly addressed as part of any bid procedures that include the proposed Stalking Horse Bid.  They must be resolved in a way that will not suppress overbidding to only the cash consideration offered by the Stalking Horse to the detriment of the Debtor's creditors. They also must be resolved in a way that does not allow the Stalking Horse to artificially inflate its bid by getting credit for assumed debts that it does not intend to pay (including any discounts already negotiated with creditors and the payables owed to itself and its affiliate).  These concerns only underscore why the structure of the proposed Stalking Horse Bid is not appropriate and likely to negatively impact the proposed auction (potentially rendering the

---

the proposed Bid Procedures).  Given PNC's substantial interest in the outcome of the auction—and since there is no Committee appointed in this case—it is entirely reasonable for PNC to want to ensure the integrity of the bidding process (including the completeness of the information being provided to potential bidders).  This oversight requires transparency from the Debtor.

Debtor's intention to make the Stalking Horse Bid subject to higher or better offers utterly meaningless).

### 3. Apparent Errors in the Stalking Horse Bid Need to Be Corrected.

32.     PNC has identified a few issues with the Stalking Horse Bid (which have been confirmed as errors by the Debtor and the Stalking Horse) that need to be corrected immediately. First, Section 1.02 of the Stalking Horse Bid states that the "Excluded Assets" are not being purchased.  Schedule 1.02 to the Stalking Horse Bid does not list any "Excluded Assets"—suggesting that the Stalking Horse is purchasing all of the Debtor's assets.

33.     PNC understands, however, that the Stalking Horse would not be purchasing the Debtor's liquor license or its equity interests in the subsidiaries (again causing confusion as to whether or not the brands owned by the subsidiaries are included in the sale).  Further, the Debtor lists an insurance claim in its Schedules relating to a disputed claim asserted by Polebridge.[8]  Polebridge's claim against the bankruptcy estate is not on the list of obligations to be assumed by the Stalking Horse, making any sale of that insurance claim to the Stalking Horse inappropriate (as it would saddle the bankruptcy estate with the liability for the claim without the corresponding insurance benefit).  The disclosure schedules to the Stalking Horse Bid need to be amended so that interested parties and potential bidders understand completely what assets are excluded from that bid.

34.     Second, the Stalking Horse Bid (throughout the document) states that the **<u>Debtor</u>** will pay at closing any cure amounts for assumed and assigned contracts.  This will not be possible, as there would not be any unencumbered proceeds from the sale from which to pay such cure amounts.  Counsel for PNC has been advised that this is an error and the agreement is

---

[8] Polebridge is owned by the spouse of the Debtor's controlling principal, Casey Parzych.

that the Stalking Horse would pay these cure amounts.  This needs to be corrected in the agreement.

35.     Finally, the ancillary agreements that would be entered into between the Debtor and the Stalking Horse must be provided (or at a minimum their economic terms must be disclosed).  The Stalking Horse Bid requires the order approving the proposed sale to approve such agreements and direct their execution by the Debtor.  The Court and interested parties cannot possibly determine the reasonableness or appropriateness of such agreements without seeing them first.

> **E.     The Sale Motion Does Not Fully Disclose Pertinent Information Relevant to the Requested Protections Under Section 363(m).**

36.     The Sale Motion is substantially lacking with respect to the disclosures required for the Court to make any findings under Section 363(m).  These disclosures are also relevant to the Debtor's selection of the Stalking Horse for the proposed sale and the overall integrity of the sale process.

37.     The Sale Motion vaguely references a "substantial investment" by the Stalking Horse in the Debtor and states that "at this time, the Buyer Affiliates have committed substantial **other investments** with the Debtor **and related businesses** with the hopes of entering into a longer-term, acceptable and stable solution with Debtor as well."  Sale Motion ¶ 9 (emphasis added).  With respect to specific connections between the Debtor and the Buyer Affiliates, the Sale Motion discloses only certain equipment leases for which the Debtor is not paying rent and currently owes more than $140,000 to the Stalking Horse and its affiliates.

38.     The Sale Motion does not describe whether these equipment leases are the "substantial investment" referenced by the Debtor or whether the Buyer Affiliates have invested something more in the Debtor besides these equipment leases.  The Sale Motion also does not

disclose that a Buyer Affiliate loaned $3.5 million to Polebridge (an entity owned by the spouse of the Debtor's controlling principal, Casey Parzych, which entered into a venture with the Debtor for the manufacture of hand sanitizer) and that Mr. Parzych is a personal guarantor of that loan.  This loan and any other "substantial investments" made by the Buyer Affiliates to the Debtor, its affiliates, or any other entities owned by insiders of the Debtor, as well as any other connections between the Debtor (or its insiders/affiliates) and the Buyer Affiliates, must be fully disclosed.

39.    The Sale Motion also fails to disclose whether there are any agreements (formal or informal) or understandings between the Debtor, Mr. Parzych, and any Buyer Affiliates regarding the loan to Polebridge or Mr. Parzych's guaranty.  The Sale Motion also fails to disclose whether there are any agreements or understandings with Mr. Parzych (or any other Debtor insiders) regarding their employment by the Stalking Horse (or any other financial incentives) if that sale closes.  Finally, the Sale Motion fails to disclose the economic terms of the proposed Master Subcontract Agreement between the Stalking Horse and the Debtor governing interim operations using the Debtor's liquor license (including whether there will be any fees or profit sharing paid to the Debtor during this time period).

40.    These disclosures are necessary for the Court to make appropriate findings under Section 363(m) if the Stalking Horse is the winning bidder.  They are also necessary to ensure the integrity of the auction process and that all potential bidders are on equal footing with the proposed Stalking Horse.

**F.**     **Objections to the Proposed Sale Timeline and Bid Procedures**

**1.**     **The proposed bid deadline of July 28 is not reasonable.**

41.     The Debtor requests that the Court approve a bid deadline of July 28—only two weeks after the bid procedures hearing—with an auction and sale hearing to follow on August 3 and August 5, respectively.  While PNC understands that this sale must proceed on a relatively quick timeline due to the Debtor's business operations, a bid deadline of July 28 is not reasonable under the circumstances.

42.     PNC has identified several issues with the Stalking Horse Bid and bidder confusion regarding the scope of the assets being offered for sale.  Several of these issues were flagged by PNC a few weeks ago and have not yet been addressed by the Debtor or the Stalking Horse.  It is uncertain what the final Stalking Horse Bid will ultimately look like or whether it can proceed as proposed.  Even if the Court determines that it can proceed, potential bidders are in the dark about the errors in the Stalking Horse Bid about the cure amounts and the assets excluded from that offer.  As these issues are not likely to be resolved until after the bid procedures hearing, bidders will have very little time after their resolution to craft their competing bids, which could have a negative impact on bidding.

43.     Moreover, PNC learned recently that the data room for the sale was not made available to bidders until July 9.  The Debtor anticipated this sale process prior to filing for bankruptcy—having the Stalking Horse Bid and Sale Motion ready for filing on the Petition Date.  Unfortunately, it took the Debtor almost three weeks after the Petition Date to get the data room up and running.

44.     Given the uncertainties with the Stalking Horse Bid and the late launch of the data room, PNC believes that a July 28 bid deadline is too rushed and will negatively impact bidding.

PNC therefore proposes that the bid deadline be pushed back by at least a week or two to ensure that all potential bidders are identified by the sale broker, that all parties have complete and accurate information about the final Stalking Horse Bid, and that all bidder questions can be addressed well in advance of the bid deadline.

45.    Currently, the Debtor's approved cash collateral budget runs through August 27, 2021, which provides two weeks of buffer from the sale timeline proposed by the Debtor (which projected that the sale would close by August 12).  There will be no harm to the Debtor in moving back the bid deadline slightly to allow fulsome due diligence by potential bidders.  On the other hand, a bid deadline of July 28 could potentially harm the Debtor's creditors if interested purchasers decline to bid because they did not get access to information in time to craft their bid.

## 2.    Objections to Bid Procedures

46.    PNC has also raised certain concerns with the proposed bid procedures and bid procedures order to the Debtor.  While PNC believes that these concerns can be resolved through discussions with the Debtor, its larger objections to the proposed sale have prevented those discussions from taking place.  It therefore is including those objections in this filing to be sure that they are preserved.

47.    PNC's specific objections are as follows:

- The proposed order approving the bid procedures preemptively approves an expense reimbursement for the Stalking Horse of up to $100,000.  There are no mechanisms or requirements, however, for the Stalking Horse to apply to the Court for approval of the expense reimbursement or to provide supporting documentation in support of the amount thereof.  The Court and parties-in-interest are entitled to appropriate information supporting the proposed expense reimbursement and there needs to be a process allowing interested parties to object if necessary.  This is especially important in this case where an affiliate of the Stalking Horse was a potential buyer of a failed pre-petition transaction (as disclosed in various pleadings filed by the Debtor).  The Court

needs to be certain that any expense reimbursement is limited to this sale and that no expenses are sought for any failed transactions.

- The Stalking Horse would be entitled to the expense reimbursement if it is outbid by a credit bid.  That is not appropriate, as there would be no sale proceeds (or funds in the Debtor's bankruptcy estate) in a credit bid scenario and therefore no way for the Debtor to pay the expense reimbursement (and arguably no benefit from the Stalking Horse Bid to the bankruptcy estate to justify the expense reimbursement).

- The Stalking Horse would be entitled to credit bid the expense reimbursement, which makes no practical sense.  First, the expense reimbursement is up to $100,000 so the amount of the reimbursement will not be determined at the time of the auction (and should be subject to approval by the Court).  Second, the Stalking Horse seeks to credit bid the expense reimbursement to overbid a third party bidder and presumably again become the high bidder.  If the Stalking Horse were then the successful bidder, it would not be entitled to any expense reimbursement, so this proposal makes little sense.  There should be no credit bit permitted for any expense reimbursement.

- The Stalking Horse is included as a Consulting Party, which is not appropriate.  Any bidder at the auction (including PNC if it chooses to credit bid) cannot be a Consulting Party.

- Paragraph 13 of the proposed order contains onerous and unreasonable requirements for a Qualified Bid relating to adequate assurance of future performance for assigned contracts (including cash flow projections, business plans, pro-formas, as well as disclosure of prior distillery experience).  While it is reasonable to request certain financial information from a bidder to prove their financial wherewithal to close the transaction, the balance of these requirements are unreasonable given the short timeframe for this sale.  They also may discourage bidders without extensive distillery experience (who can easily bring in someone with that experience to manage the business if necessary).  To the extent any party to an assumed and assigned contract wants additional assurance of future performance from a potential bidder, they will get notice of the proposed assumption and assignment of their contract and can proceed accordingly to assert their rights under the Bankruptcy Code.

- While the proposed order and Bid Procedures preserves PNC Bank's right to credit bid, it does not preserve credit bid rights to PNC Equipment Finance, other secured creditors of the Debtor, or their respective successors and assigns.

- The Bid Procedures would require Qualified Bidders to post a 10% deposit when they submit their bids (except for a credit bid).  The Stalking Horse, however, was only required to post a 5% deposit (with an additional 5% due if the Stalking Horse becomes the winning bidder).  There must be parity

between the deposit required for the Stalking Horse and other Qualified Bidders.

- The provisions governing a credit bid do not allow for the proposed assumption of secured claims, but require the credit bid to provide for the satisfaction of such claims.  Like the Stalking Horse, any party submitting a credit bid should be permitted to provide for the assumption of senior secured debt as part of its bid.

- The Bid Procedures must require any Qualified Bid to provide for the Qualified Bidder to pay any cure amounts for assumed and assigned contracts, unless the Winning Bid is sufficient to pay all secured claims (except for any secured claims being assumed by the buyer) and all such cure amounts in full. This is necessary to ensure adequate protection for the Debtor's secured creditors (as their liens will attach to the proceeds of the sale) and to be sure that the sale can be approved free and clear of liens (which undoubtedly will be required by any winning bidder).

WHEREFORE, PNC Bank, National Association, and PNC Bank Equipment Finance, LLC (collectively, "PNC") respectfully requests that the Court enter an order (i) denying the approval of the Stalking Horse Bid as proposed by the Debtor; (ii) alternatively, conditioning such sale on the provision of adequate protection to PNC; (iii) denying approval of the sale timeline and bid procedures as proposed by the Debtor; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: July 12, 2021

**DILWORTH PAXSON LLP**

By: /s/ Jennifer L. Maleski
Jennifer L. Maleski
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
jmaleski@dilworthlaw.com

*Counsel for the PNC Bank, National Association and PNC Equipment Finance, LLC*