**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Midnight Madness Distilling LLC,** | **Case No. 21-11750-mdc** |
| **Debtor.** | |

**MOTION OF ETOH WORLDWIDE, LLC FOR ALLOWANCE OF
EXPENSE REIMBURSEMENT AND TO COMPEL PAYMENT**

ETOH Worldwide, LLC ("ETOH") hereby requests that this Court enter an Order allowing the Expense Reimbursement (as defined below) and compelling Millstone Spirits, LLC ("Millstone") to pay the Expense Reimbursement, and in support thereof states as follows:

**INTRODUCTION**

1.  ETOH was the stalking-horse bidder[1] for the sale of the assets of the above-captioned debtor, Midnight Madness Distilling LLC (the "Debtor"). When no one else was interested in acquiring the Debtor's assets or otherwise investing in its future, ETOH entered into a contract to acquire the Debtor's assets. In order to encourage ETOH to take this step, the Debtor agreed to various incentives for ETOH to make its stalking-horse bid, including a right to reimbursement of its expenses – up to $100,000 – if the Debtor sold its assets to someone else.

2.  As a result of ETOH's efforts, the auction of the Debtor's assets – including multiple bids by both ETOH and the successful bidder, Millstone – resulted in a sale of

---

[1] "A stalking horse refers to an entity that is willing to place a bid on a debtor's asset in order to either set a baseline bid from which the true value of the estate can be assessed or serve as a catalyst to inspire other bidders." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 744 (3d Cir. 2021) (citing *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992)).

the Debtor's assets for $1.4 million in cash (an increase of $375,000 over ETOH's initial bid) , plus other consideration. In its asset purchase agreement with the Debtor, Millstone assumed liability for the Expense Reimbursement due to ETOH. Millstone closed on the acquisition of the Debtor's assets on September 30, 2021.

3. ETOH incurred at least $95,857.50 in legal fees in its efforts to acquire the Debtor's assets through a sale under Section 363 of the Bankruptcy Code. These were actual and necessary expenses, and the amount reasonably reflects the work done.

4. This Court should approve the Expense Reimbursement for two independent reasons. First, as a matter of contract law, ETOH is entitled to payment of the Expense Reimbursement, and Millstone is obligated to pay it.

5. Second, alternatively, ETOH is entitled to the Expense Reimbursement as an administrative expense pursuant to Section 503(b)(1)(B) of the Bankruptcy Code.

## JURISDICTION

6. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334(b).

7. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (N), (O).

8. In addition, this proceeding is under the exclusive jurisdiction reserved by this Court in paragraph 34 of the Procedures Order (as defined below) and paragraph 34 of the Sale Order (as defined below). (Ex. A, ECF 110, Procedures Order ¶ 34; Ex. B, ECF 178, ¶ 34.)

9. In addition, Millstone has submitted itself to the exclusive jurisdiction of this Court, as provided in paragraph 7 of the Procedures Order (Ex. A, ECF 110,

Procedures Order ¶ 7) and Section 12.08(a) of the Millstone APA (as defined below) (Ex. C, ECF 172-1, Millstone APA § 12.08(a)).

## BACKGROUND

**ETOH's Proposed Acquisition of the Debtor's Assets**

10.     Beginning in early 2021, affiliates of ETOH began discussions with the Debtor about entering into a transaction to acquire the equity or assets of the Debtor as a going concern.

11.     The contentious nature of the relationship among the equityholders of the Debtor made it impossible for ETOH to acquire the Debtor or its assets as a going concern outside of bankruptcy.

12.     At that time, no other person or entity was seriously considering an acquisition of the Debtor or its assets, or otherwise investing in the Debtor's future.[2]

13.     At the beginning of April 2021, the Debtor and ETOH began to discuss how to proceed with a proposed sale of the Debtor's assets to ETOH through a sale of assets pursuant to Section 363 of the Bankruptcy Code. Beginning at that time and proceeding through the Petition Date, the Debtor and ETOH engaged in intensive efforts to achieve a sale, including, without limitation, negotiating and drafting an asset purchase agreement and accompanying documents; conducting due diligence concerning the Debtor's assets and affairs; analyzing various issues related to the sale,

---

[2] There were discussions with Anthony Lorubbio, one of the members of Debtor, that either he or an investor was interested in investing further in the Debtor. However, these discussions did not result in any concrete proposal or written offer of any kind.

including the assumption and assignment of contracts; and negotiating with creditors about the proposed sale.

14. On the Petition Date (as defined below), the Debtor and ETOH entered into an Asset Purchase Agreement. (ECF 4-1, the "Original ETOH APA.".) The Original ETOH APA contemplated that the Debtor would seek approval of the Original ETOH APA through a motion pursuant to Section 363 and other relevant provisions of the Bankruptcy Code.

15. In order to incentivize ETOH to enter into and pursue a closing under the Original ETOH APA, the Debtor agreed to various benefits in favor of ETOH. Among other things, the Debtor agreed that if, after entering into the asset purchase agreement and undertaking other efforts aimed at acquiring the Debtors' assets, ETOH did not acquire the Debtor's assets for certain specific reasons, ETOH would be entitled to reimbursement of its expenses in an amount up to $100,000. (ECF 4-1, Original ETOH APA § 8.01(ii).)

**The Debtor's Bankruptcy Case and the Sale Process**

16. The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, on June 21, 2021 (the "Petition Date"). (ECF 1.)

17. On the Petition Date, the Debtor filed its Expedited Motion For Entry of An Order: (I) Approving the Sale or Sale of Up to Substantially All of the Debtor's Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Scheduling Hearings for Such Relief and (IV) Granting Related Relief (ECF 4, the "Sale Motion").

4

18. In the Sale Motion, the Debtor sought this Court's approval of: (1) procedures for the Debtor to market its assets to other potential purchasers, and for those purchasers to submit competing bids and participate in an auction to set the sale price and determine the ultimate purchaser of the Debtor's assets; and (2) the Debtor's sale of substantially all of its assets to ETOH in accordance with the Original ETOH APA, or to the successful bidder at the aforementioned auction.

19. Subsequent to the filing of the Sale Motion, PNC Bank and the United States Trustee contacted the Debtor to raise various issues with the Sale Motion, including in particular the procedures for the marketing of the Debtor's assets, the submission of bids, and the auction. PNC Bank (ECF 76) and the U.S. Trustee (ECF 140) subsequently filed objections to the Sale Motion and the proposed sale procedures.

20. In order to address some or all of the issues raised by PNC Bank and the U.S. Trustee, the Debtor and ETOH entered into a revised Asset Purchase Agreement on July 27, 2021. (ECF 102, the "ETOH APA," a copy of which is attached hereto as Exhibit D.)

21. Section 8.01 of the ETOH APA provided, *inter alia*, that this Court's order approving sale procedures must include a provision

> [A]pprov[ing] the reimbursement of actual and necessary expenses, including reasonable attorney's fees, incurred by Buyer in connection with the negotiation and entry into this Agreement, due diligence with respect to the transactions contemplated herein, and obtaining Bankruptcy Court approval of this Agreement, in an amount not to exceed $100,000 (the "**Expense Reimbursement**") payable to the Buyer, each of which shall constitute an administrative expense against Seller's bankruptcy estate under the applicable version of the Bankruptcy Code, upon motion of the Buyer and order of the Bankruptcy Court if Seller sells, transfers, assigns, encumbers, leases, or licenses all or a material portion of the Purchased Assets to any other person

5

> (whether through sale of assets, sale of stock, merger, consolidation, business combination, lease, license, affiliation, joint venture, investment in the Seller or any other transaction), or the Seller files a plan or reorganization that does not contemplate the transactions contemplated by this Agreement (collectively, the "**Proposed Transaction**") or any such plan (filed by any person or entity) is confirmed; provided, however that such Expense Reimbursement shall not apply if the transaction effected by the Seller follows a material breach by the Buyer of any of its material representations, warranties or covenants set forth herein ….

(Ex. D, ETOH APA ¶ 8.01(ii).

22. The review and approval of the various documents regarding the sale and bid procedures required substantial discussions with the Debtor and PNC Bank, N.A. in an effort to ensure that the documentation was acceptable to all parties.

23. On August 12, 2021, this Court entered an Order (I) Scheduling a Hearing to Consider Approval of the Sale or Sales of Substantially All of the Debtor's Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Approving Payment Expense Reimbursement Under Certain Conditions, and (IV) Granting Related Relief (ECF 110, the "Procedures Order," a copy of which is attached as Exhibit A).

24. The Procedures Order provided for an auction to obtain the highest and best price for the Debtor's assets. (Ex. A, Procedures Order.)

25. In addition, the Procedures Order approved the Expense Reimbursement, as provided in the ETOH APA. In particular, the Procedures Order states:

> 24. If the Sale of the Assets to the Buyer is not consummated under circumstances that render the Expense Reimbursement payable as provided in the APA, then within five (5) business days of the Closing Date, the Buyer shall move this Court for payment of the Expense Reimbursement

>in an amount not to exceed $100,000. The foregoing shall not limit the right of the Buyer to seek specific performance of the APA at any time after the entry of an order of this Court approving the APA.
>
>25. Upon approval by the Court, the Buyer shall be paid the Expense Reimbursement from the cash proceeds of the Successful Bid at closing, or other sources if necessary, prior to payment from such proceeds (or other sources) of any claims against the Debtor, including claims secured by the proceeds of such Successful Bid (or other sources), and any holders of claims secured by such proceeds (or other sources) shall be deemed to have released their security interests in such proceeds (or other sources) to the extent of the approved Expense Reimbursement. The Buyer reserves the right to seek to have the Expense Reimbursement, to the extent due and owing, to be deemed an expense of administration of the Debtor's estate pursuant to 11 U.S.C. § 503 senior in priority to any other expenses of administration to the extent of the proceeds of the Sale, and PNC reserves the right to object to such priority treatment.

(Ex. A, Procedures Order ¶¶ 24, 25.)

**The Sale Process and the Sale to Millstone**

26. Pursuant to the Procedures Order, Millstone qualified as a bidder for the Debtor's assets. In addition, PNC Bank, N.A., the Debtor's principal secured creditor, qualified as a credit bidder.

27. An auction of the Debtor's assets was held on August 25, 2021. There was extensive bidding during the auction, including by ETOH, during which the cash portion of the purchase price for the assets increased by $375,000.

28. Ultimately, Millstone was the successful bidder at the auction. Millstone's successful bid included a cash payment of $1.4 million, assumption of the Expense Reimbursement and other liabilities, and other consideration.

29. Subsequently, the Debtor and Millstone entered into a new Asset Purchase Agreement. (ECF 172-1, the "Millstone APA," a copy of which is attached hereto as

7

Exhibit C.) The Millstone APA provides: "The aggregate purchase price for the Purchased Assets shall be One Million Four Hundred Thousand Dollars $1,025,0001,400,000.00), plus the assumption of the Assumed Liabilities, **plus the Expense Reimbursement in an amount up to $100,000, as provided in the Bid Procedures Order** (the "Purchase Price"). (*Id.* at § 1.05 (emphasis added).)

30. On September 17, 2021, this Court entered an Order granting the Sale Motion and approving the sale of the Debtor's assets to Millstone. (ECF 178, the "Sale Order".) In particular, the Sale Order provides: "The Asset Purchase Agreement, including all of its terms and conditions, and the Sale Transaction are hereby approved." (Ex. B, ECF 178, Sale Order ¶ 3.)

31. The sale of the Debtor's assets to Millstone closed on September 30, 2021. (ECF 186.)

## RELIEF REQUESTED

32. ETOH respectfully requests that the Court enter an order allowing the Expense Reimbursement in the amount of $95,857.50, and directing Millstone to pay the Expense Reimbursement.

## GROUNDS FOR REQUESTED RELIEF

**Millstone is Obligated to Pay the Expense Reimbursement to ETOH**

33. Under the Procedures Order, the Sale Order, and the Millstone APA, Millstone is obligated to pay the Expense Reimbursement to ETOH.

34. The Procedures Order authorizes ETOH to seek payment of the Expense Reimbursement "[i]f the Sale of the Assets to the Buyer is not consummated under circumstances that render the Expense Reimbursement payable as provided in the APA." (Ex. A, Procedures Order ¶¶ 24, 25.) The Expense Reimbursement is payable as

8

provided in the ETOH APA "if [the Debtor] sells, transfers, assigns, encumbers, leases, or licenses all or a material portion of the Purchased Assets to any other person (whether through sale of assets, sale of stock, merger, consolidation, business combination, lease, license, affiliation, joint venture, investment in the Seller or any other transaction)." (Ex. D, ETOH APA § 8.01(ii).)

35. The Debtor has sold all of its assets to Millstone, not ETOH, and accordingly the Expense Reimbursement is payable as provided in the ETOH APA.

36. In the Millstone APA, Millstone assumed liability for the Expense Reimbursement as part of its purchase price. (Ex. E, Millstone APA § 1.05.) This Court approved the Millstone APA in the Sale Order. (Ex. B, ECF 178, Sale Order ¶ 3.) Accordingly, Millstone has succeeded to the Debtor's obligation to pay the Expense Reimbursement. *See Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 308–09 (3d Cir. 1985) ("[W]here (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor ... a successor corporation may be held responsible for the debts and liabilities of its predecessor."); *Dale v. Webb Corp.,* 252 F. Supp. 2d 186, 189 (E.D. Pa. 2003) ("Generally, in Pennsylvania, when one corporation sells or transfers its assets to a second corporation, the successor does not become liable for the debts and liabilities of the predecessor [unless] the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor...." (citations and quotations omitted)).

37. Put differently, ETOH and the Debtor entered into a contract (the ETOH APA) that required that the Debtor pay the Expense Reimbursement if certain conditions occur. Those conditions have now occurred, and Millstone has explicitly assumed the Debtor's liability for the Expense Reimbursement in the Millstone APA.

9

38. ETOH has a contractual right to payment of the Expense Reimbursement, and Millstone assumed liability for that payment.

39. Accordingly, the Procedures Order, the Sale Order, and the Millstone APA require Millstone to pay the Expense Reimbursement to ETOH.

**The Court Should Allow the Expense Reimbursement as an Administrative Expense**

40. Alternatively, ETOH is entitled to allowance of the Expense Reimbursement as an administrative expense pursuant to Section 503(b)(1)(A) of the Bankruptcy Code. As set forth above, ETOH's expenses incurred in pursuing the acquisition of the Debtor's assets qualify as an Expense Reimbursement under the ETOH APA and the Procedures Order. In addition, ETOH's efforts to pursue the acquisition, including the aforementioned expenses, benefited the Debtor's estate by enabling the Debtor's sale process and, ultimately, Millstone's acquisition of the Debtor's assets for a purchase price that included $1.4 million in cash.

41. Pursuant to Section 503(b)(1)(A), "After notice and a hearing, there shall be allowed administrative expenses … including – the actual, necessary costs and expenses of preserving the estate…." 11 U.S.C. § 503(b)(1)(A). Section 503(b)(1)(A) "limit[s] [recovery] to those claims that are actual and necessary [to] prevent[ ] the estate from being consumed by administrative expenses[ ] and preserve[ ] the estate for the benefit of the creditors." *In re Marcal Paper Mills, Inc.,* 650 F.3d 311, 315 (3d Cir. 2011).

42. An administrative expense claim is entitled to priority under Section 503(b)(1)(A) if: (1) there was a "post-petition transaction between the claimant and the estate," and (2) those expenses yielded a "benefit to the estate." *In re Women First*

10

*Healthcare, Inc.,* 332 B.R. 115, 121 (Bankr. D. Del. 2005); *see In re Goody's Family Clothing, Inc.*, 610 F.3d 812, 818 (3d Cir. 2010) (citing *In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir. 1976)). These standards apply specifically to a request for approval of an expense reimbursement by an unsuccessful stalking-horse bidder. *In re Energy Future Holdings Corp.,* 990 F.3d 728, 741–42 (3d Cir. 2021); *Women First,* 332 B.R. at 121.

43. As to the first element, the Expense Reimbursement is the result of a post-petition transaction between ETOH and the Debtor. The Debtor and ETOH executed the revised ETOH APA on July 27, 2021, after the Petition Date.

44. As to the second element, ETOH's efforts that underlie the amounts sought as the Expense Reimbursement plainly benefited the Debtor's estate.

45. In the context of a stalking-horse bidder, such as ETOH, the Court of Appeals has recognized that the "benefit" required under Section 503(b)(1)(A) can include "(1) 'promot[ing] more competitive bidding' by 'induc[ing] an initial bid' or 'inducing a bid that otherwise would not have been made and without which bidding would have been limited'; and, (2) 'encourag[ing] a prospective bidder to do the due diligence' to 'research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, … [which] increas[es] the likelihood that the price at which the debtor is sold will reflect its true worth.'" *Energy Futures*, 990 F.3d at 742 (quoting *In re O'Brien Environmental Energy, Inc.,* 181 F.3d 527, 535 (3d Cir. 1999)) (alterations in original).

46. Here, it is beyond cavil that ETOH's efforts benefited the Debtor's estate in precisely these ways. Among other things:

- Without ETOH's submitting the initial bid, the Debtor would not have had any opportunity to sell its assets. Until the Procedures Order was entered, there were no other entities seriously interested in acquiring the Debtor's assets or otherwise providing value that could benefit the Debtor's creditors.

- ETOH drafted and negotiated the final form of an asset purchase agreement, which then formed the basis of the bids of other interested parties, and ultimately the Millstone APA. (ECF 173, Redline Comparison of ETOH APA and Millstone APA.)

- As a result of the Procedures Order, Millstone and PNC Bank (as a credit bidder) submitted bids to acquire the Debtor's assets.

- The ensuing auction involved lively bidding by ETOH and Millstone.

- As a result of the auction, Millstone agreed to acquire the Debtor's assets for $1.4 million in cash, along with other consideration. This amount was $375,000 more than the cash portion of ETOH's original proposal.

- In addition, the Millstone APA includes the possibility of additional cash being made available for payments to creditors other than the Debtor's secured creditors.

- The Debtor has now closed on the sale of its assets to Millstone.

47. Without ETOH's efforts, the Debtor would have had to close down its business and/or liquidate through a Chapter 7 bankruptcy. (ECF 4, Sale Motion ¶ 8 ("Without an outside investment and continuation of support from [ETOH], the Debtor will be unable to pay debt service and continue operations.").) In short, ETOH's efforts provided the Debtor the opportunity to sell its assets as a going concern and obtain substantial value for its creditors.

48. As a result of the foregoing, ETOH's efforts plainly benefited the Debtor's estate, and support the allowance of the Expense Reimbursement as an administrative expense pursuant to Section 503(b)(1)(A).

**The Expense Reimbursement Should be Approved in the Amount of $95,857.50**

49. Pursuant to the ETOH APA, ETOH is entitled to recover as the Expense Reimbursement its "actual and necessary expenses, including reasonable attorney's fees, incurred by Buyer in connection with the negotiation and entry into this Agreement, due diligence with respect to the transactions contemplated herein, and obtaining Bankruptcy Court approval of this Agreement...." (Ex. D, ETOH APA § 8.01(ii).)

50. Likewise, under Section 503(b)(1)(A), attorney's fees may be allowed as an administrative expense if they are reasonable. *Energy Future*, 990 F.3d at 742 (citing *In re Express One Int'l, Inc.,* 217 B.R. 207, 211 (Bankr. E.D. Tex. 1998)).

51. Attached hereto as Exhibit E is the Declaration of David M. Scolnic in Support of this Motion, which includes a detailed report that shows the name of the attorney or paralegal, date, activity, and time expended for which the Expense Reimbursement is sought.

52. Exhibit E reflects the services provided to ETOH. The fees for those services totals at least $95,857.50.[3]

53. The fees set forth in Exhibit E are reasonable compensation for actual and necessary services rendered "in connection with the negotiation and entry into [the ETOH APA], due diligence with respect to the transactions contemplated [t]herein, and obtaining Bankruptcy Court approval of" the ETOH APA. (Ex. D, ETOH APA ¶ 8.01(ii).)

---

[3] ETOH incurred additional fees before April 8, 2021, in connection with its interest in investing in the Debtor or its assets in some fashion. Although ETOH has not included those fees in the Expense Reimbursement, ETOH reserves the right to do so.

13

WHEREFORE, ETOH Worldwide LLC respectfully requests that the Court enter an order allowing the Expense Reimbursement in the amount of $95,857.50, and directing Millstone to pay the Expense Reimbursement, and granting such other and further and relief as the Court deems appropriate.

                                                       HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

Dated: October 7, 2021                By:  */s/ Matthew A. Hamermesh*
                                                              Matthew A. Hamermesh
                                                              One Logan Square, 27th Floor
                                                              Philadelphia, PA 19103
                                                              T: (215) 568-6200
                                                              F: (215) 568-0300
                                                              E: mhamermesh@hangley.com

                                             *Counsel for ETOH Worldwide LLC*

14