# EXHIBIT C

**ASSET PURCHASE AGREEMENT**

MIDNIGHT MADNESS DISTILLING, LLC,
as Seller

AND

MILLSTONE SPIRITS GROUP, LLC,
as Buyer

# TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE ............................................................................. 1

**Section 1.01 Purchase and Sale of Assets.** ............................................................ 1

**Section 1.02 Excluded Assets.** .............................................................................. 3

**Section 1.03 Assumed Liabilities.** ........................................................................ 3

**Section 1.04 Definition of Liabilities; Excluded Liabilities.** .............................. 4

**Section 1.05 Purchase Price.** ................................................................................ 5

Section 1.06 Allocation of Purchase
Price……………………………………………………………………………….5

**Section 1.07 Withholding Tax.** ............................................................................. 6

**Section 1.08 Third Party Consents.** ..................................................................... 6

**Section 1.09 Cash
Holdback**…………………………………………………………………………
………………..6

ARTICLE II CLOSING ............................................................................................... 7

**Section 2.01 Closing.** ............................................................................................ 7

**Section 2.02 Closing Deliverables.** ...................................................................... 7

**Section 2.03 Assigned Contracts.** ........................................................................ 8

**Section 2.04 Prorations.** ....................................................................................... 9

**Section 2.05 Closing Expenses.** ........................................................................... 9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ................................. 9

**Section 3.01 Organization and Authority of Seller.** ............................................ 9

**Section 3.02 No Conflicts or Consents.** ............................................................. 10

**Section 3.03 Financial Statements.** .................................................................... 10

**Section 3.04 Undisclosed Liabilities.** ................................................................. 10

**Section 3.05 Assigned Contracts.** ...................................................................... 10

**Section 3.06 Title to Purchased Assets.** ............................................................. 11

**Section 3.07 Legal Proceedings; Governmental Orders.** ................................... 11

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER .............................. 11

**Section 4.01 Organization and Authority of Buyer.** .......................................... 11

**Section 4.02 No Conflicts; Consents.** ................................................................. 12

**Section 4.03 Legal Proceedings.** ........................................................................ 12

ARTICLE V COVENANTS ........................................................................................ 12

**Section 5.01 Receivables.** ...................................................................................... 12

**Section 5.02 Further Assurances.** ......................................................................... 12

**Section 5.03 Bulk Sales.** ...................................................................................... 12

**Section 5.04 Liquor Licenses; Transition Date; Post-Closing Contracts.** ..................... 13

**Section 5.05 Continued Performance; Payment of Trade Payables** ............................ 13

ARTICLE VI CONDITIONS TO BUYER'S OBLIGATIONS .......................................... 14

**Section 6.01 Consents.** ........................................................................................ 14

**Section 6.02 Representations and Warranties Accurate.** ............................................. 14

**Section 6.03 Performance.** ................................................................................... 15

**Section 6.04 No Actions, Suits or Proceedings.** ...................................................... 15

**Section 6.05 Closing Deliveries.** ........................................................................... 15

**Section 6.06 Bankruptcy Court Approval.** ............................................................. 15

**Section 6.07 Title Insurance.** ............................................................................... 15

ARTICLE VII CONDITIONS TO SELLER'S OBLIGATIONS ........................................ 15

**Section 7.01 Representations and Warranties to be True and Correct.** ........................ 15

**Section 7.02 Performance.** ................................................................................... 15

**Section 7.03 No Actions, Suits or Proceedings.** ...................................................... 15

**Section 7.04 Closing Deliveries.** ........................................................................... 16

**Section 7.05 Bankruptcy Court Approval.** ............................................................. 16

ARTICLE VIII BANKRUPTCY COURT APPROVALS ................................................ 16

**Section 8.01 Bankruptcy Bidding Procedures.** ....................................................... 16

**Section 8.02 Bankruptcy Court Approvals.** ............................................................ 16

**Section 8.03 Bankruptcy Integral Part of Transaction.** ............................................. 16

ARTICLE IX INDEMNIFICATION ......................................................................... 17

**Section 9.01 Survival.** ......................................................................................... 17

**Section 9.02 Indemnification by Seller.** ................................................................. 17

**Section 9.03 Indemnification by Buyer.** ................................................................. 17

**Section 9.04 Indemnification Procedures.** .............................................................. 18

**Section 9.05 Cumulative Remedies.** ...................................................................... 18

ARTICLE X TERMINATION .................................................................................. 18

**Section 10.01 Termination.** .................................................................................. 18

**Section 10.02 Effect of Termination.** ..................................................................... 19

ARTICLE XI DEFAULT; REMEDIES ...................................................................... 19

**Section 11.01 Seller Defaults.** ........................................................................ 20

**Section 11.02 Buyer Defaults.** ......................................................................... 20

**Section 11.03 Disposition of Purchase Price Deposit.** ..................................... 20

ARTICLE XII MISCELLANEOUS ....................................................................... 20

**Section 12.01 Reserved.** .................................................................................... 21

**Section 12.02 Notices.** ...................................................................................... 21

**Section 12.03 Interpretation; Headings.** .......................................................... 21

**Section 12.04 Severability.** ............................................................................... 21

**Section 12.05 Entire Agreement.** ..................................................................... 22

**Section 12.06 Successors and Assigns.** ............................................................ 22

**Section 12.07 Amendment and Modification; Waiver.** .................................... 22

**Section 12.08 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.** ...... 22

**Section 12.09 Counterparts.** ............................................................................. 23

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of September 15, 2021, is entered into between **MIDNIGHT MADNESS DISTILLING, LLC**, a Pennsylvania limited liability company ("**Seller**"), **Splint, LLC**, a Pennsylvania limited liability company ("**Splint**"), **Brace, LLC**, a Pennsylvania limited liability company ("**Brace**"), **Cane, LLC**, a Pennsylvania limited liability company ("**Cane**"), **Crutch, LLC**, a Pennsylvania limited liability company ("**Crutch**"), **Walker, LLC**, a Pennsylvania limited liability company ("**Walker**"), and **Spectre Distributing, LLC**, a Delaware limited liability company ("**Spectre**" and together with Sprint, Brace, Cane, Crutch and Walker, the "**Seller Subs**") and **MILLSTONE SPIRITS GROUP, LLC**, a Delaware limited liability company ("**Buyer**").

## RECITALS

**WHEREAS**, Seller is engaged in the business of distilling and producing spirits (the "**Business**");

**WHEREAS,** the Seller filed a voluntary petition for bankruptcy relief initiating a case (the "**Bankruptcy Case**") on June 21, 2021 (the "**Petition Date**") under Chapter 11 of the U.S. Bankruptcy Code (the "**Bankruptcy Code**") styled *In re Midnight Madness Distilling, LLC*, Case No. 21-11750 in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**"); and

**WHEREAS,** subject to the terms and conditions of this Agreement and pursuant to either the Plan of Reorganization, if any, which may become effective by order of the Bankruptcy Court or pursuant to Sections 363 and 365 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure, the Seller desires to sell to the Buyer, and the Buyer desires to purchase from the Seller, the Purchased Assets, as defined in Section 1.01 hereof.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in, to, and under all of the tangible and intangible assets, properties, and rights of every kind and nature and wherever located (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "**Purchased Assets**"), including the following:

(a)      all cash and cash equivalents, with the exception that, to the extent the Available Cash (as defined in Section 1.09(d) herein) on the Closing Date (as defined herein) exceeds $200,000, Buyer agrees to a carve-out of fifty-thousand dollars ($50,000) (the "**Carve Out**") for the Seller's bankruptcy estate, to be disbursed in accordance with the priority scheme provided by the Bankruptcy Code.

(b)      all accounts receivable held by Seller ("**Accounts Receivable**");

(c)      all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories ("**Inventory**");

(d)      all Contracts (the "**Assigned Contracts**") that are either (i) set forth on **Schedule 1.01** hereto or (ii) Buyer elects, in its sole discretion, to assume prior to Closing. The term "**Contracts**" means all contracts, purchase orders, equipment and real property leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral;

(e)      the following real estate of Seller (collectively, the "**Real Property**"):

(i)      the fee simple absolute interest in the property known as 118 N. Main Street, Trumbauersville Borough, Bucks County, Pennsylvania, known as tax parcel No. 45-003-006-001 (the "**Fee Property**");

(ii)      the leasehold interest in 2300 Trumbauersville Road, Quakertown, Pennsylvania under lease with Finland Leasing Co. Inc. dated January 1, 2016; and

(iii)      the leasehold interest in 300 Commerce Blvd, Quakertown, Pennsylvania under lease with Milford Business Centre dated January 26, 2021.

The leasehold and sub-leasehold interests referred to in subsections 1.01(e)(ii), and (iii), hereof are sometimes referred to herein collectively as the "**Leased Properties**" and the leases to which the same are subject are referred to herein as the "**Assigned Leases**."

(f)      all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, and other tangible personal property (the "**Tangible Personal Property**");

(g)      all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees (including any such item relating to the payment of Taxes);

(h)      all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Purchased Assets;

(i)      all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets, or the Assumed Liabilities and including, without limitation, the benefits accruing to Seller;

(j)      originals or, where not available, copies, of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures,

customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction (collectively, "**Governmental Authority**")), sales material and records, strategic plans and marketing, and promotional surveys, material, and research ("**Books and Records**");

(k)     any claims or causes of action the Seller or its bankruptcy estate have, had, or may have against Buyer or any of its affiliates, or any holder of an Assumed Liability, including, without limitation, any claims or causes of action pursuant to Sections 544, 547, 548, 549, or 550 of the Bankruptcy Code;

(l)     all goodwill and the going concern value of the Purchased Assets and the Business; and

(m)     all intellectual property owned by Seller and/or the Seller Subs, including, but not limited to, trademarks, tradenames, copyrights, patents and trade secrets, product formulas, blending formulas and recipes, any TTB approved formulas, and any licenses of any intellectual property.

**Section 1.02   Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include the assets, properties, and rights specifically set forth on **Schedule 1.02** of the Disclosure Schedules attached hereto and made a part hereof (the "**Disclosure Schedules**") (collectively, the "**Excluded Assets**").

**Section 1.03   Assumed Liabilities.**  Buyer shall not assume or be responsible for any Liabilities of the Seller, except that Buyer shall only assume the following Liabilities (the "**Assumed Liabilities**"):

(a)     Buyer shall assume and perform the obligations of Seller under the Assigned Contracts, including, without limitation the payment of any Cure Amounts (as defined in Section 2.03), and excise taxes and sales taxes (to the extent set forth in such Assigned Contracts and not to exceed the amount set forth in Section 1.04(c) hereof), but otherwise excluding any Excluded Liabilities, as hereinafter defined;

(b)     Buyer shall assume and perform those obligations of Seller under the Assigned Contracts with Seller's customers that accrue or arise on or after the Petition Date, to the extent such obligations relate to invoices paid by customers after the Closing;

(c)     Buyer shall assume and perform those obligations of Seller listed on **Schedule 1.03** of the Disclosure Schedules and identified as Assumed Liabilities;

(d)     Buyer shall assume and perform those monetary obligations of the Seller under the Seller's Equipment Leases with Agtech IV, LLC and ETOH Worldwide LLC (the "**Rejected Leases**") that arise on or after the Petition Date, to the extent that (i) such obligations are administrative claims (the "**Agtech/ETOH Admin Claims**") allowed pursuant to Section 503 of the Bankruptcy Code by a final, non-appealable order of the Bankruptcy Court; (ii) the Buyer shall be entitled, and have standing to object to any such

Motion seeking allowance of the Agtech/ETOH Admin Claims; (iii) the Buyer shall have no obligations with respect to the Rejected Leases or the Agtech/ETOH Admin Claims other than as expressly provided herein.

### Section 1.04  Definition of Liabilities; Excluded Liabilities.

(a)      For purposes of this Agreement, "**Liabilities**" means liabilities, obligations, or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

(b)      Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities. Liabilities not included in Assumed Liabilities being referred to herein as the "**Excluded Liabilities.**" For purposes of this Agreement: (i) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(c)      Without limiting the foregoing, Excluded Liabilities include, and the Buyer expressly is not assuming any of the following Liabilities, whether accrued or fixed, absolute or contingent, known or unknown, determined or determinable, and whenever arising:

(i)      any Liabilities of the Seller for federal, state, local or foreign taxes (including, without limitation, franchise, income, single business, sales, use, us and occupancy, payroll, occupation, property, excise, withholding, and other taxes), except for excise taxes payable as of the date hereof up to the amount of $198,751 and sales taxes currently payable up to the amount of $44,084;

(ii)      any claims (as defined in Section 101(5) of the Bankruptcy Code), demands, Liabilities or obligations of any nature whatsoever (including, without limitation, claims, demands, liabilities or obligations in respect of advances or loans, goods sold, environmental matters, employee-related claims, occupational safety, workers' or workmen's compensation, grievance proceedings or actual or threatened litigation, suits, claims, demands or governmental proceedings) which arose or were incurred on or before the Closing Date, or which are based on events occurring or conditions existing on or before the Closing Date, or which are based on products sold or services performed by the Seller on or before the Closing Date;

(iii)      any Liabilities of the Seller under this Agreement, the Deed, Bill of Sale, Assignment and Assumption Agreement, Assignment of Leases, or any other

document issued in connection with this Agreement or otherwise in connection with the transactions contemplated by this Agreement;

       (iv)     Except as expressly set forth in Article V hereof, any Liabilities of the Seller to present or former employees (or their beneficiaries), consultants or agents for continued employment or for any compensation, pension contribution or other benefits accrued or otherwise payable (including, without limitation, any WARN Act liabilities, if any); or

       (v)     Liabilities to or of present or former members, managers, officers or board members of Seller.

**Section 1.05  Purchase Price.** The aggregate purchase price for the Purchased Assets shall be One Million Four Hundred Thousand Dollars ($1,400,000.00), plus the assumption of the Assumed Liabilities, plus the Expense Reimbursement in an amount up to $100,000, as provided in the Bid Procedures Order (the "**Purchase Price**"). Buyer shall pay the Purchase Price as follows:

       (a)     Contemporaneous herewith, the Buyer shall deliver a sum equal to five percent (5%) of the Purchase Price in the form of readily available funds (the "**Deposit**") to Flaster/Greenberg P.C. to secure the Buyer's obligations under this Agreement. The Deposit shall be fully refunded to the Buyer within five (5) business days of the termination of this Agreement pursuant to **Section 10.1(c)(ii)**;

       (b)     If the Buyer is the Successful Bidder or a Back- Up Bidder (as defined in the Bid Procedures Order), Buyer shall increase the Deposit to an amount equal to ten percent (10%) of the cash amount of the Purchase Price, pursuant to the Bid Procedures Order.

       (c)     At Closing, the Buyer shall pay the balance of the Purchase Price.

       (d)     For the avoidance of doubt, the delivery by the Buyer of the Deposit and the additional deposit pursuant to Sections 1.05(a)-(b) shall not constitute a fraudulent transfer or conveyance by the Buyer to Flaster/Greenberg P.C., and Flaster/Greenberg P.C. shall not be deemed a transferee. Flaster/Greenberg P.C. shall hold the Deposit in its trust account; shall act as the Escrow Agent for the Deposit, and shall only release the Deposit in accordance with **Section 10.02** and **Article 11** hereof.

**Section 1.06  Allocation of Purchase Price.** The Purchase Price and the Assumed Liabilities shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule set forth on **Schedule 1.06** of the Disclosure Schedules (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("**Tax Returns**") in a manner consistent with the Allocation Schedule.

    **Section 1.07   Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

    **Section 1.08   Third Party Consents.** To the extent that Seller's rights under any Purchased Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, and if Buyer shall nevertheless in its sole discretion agree to complete Closing without such consent, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.  Nothing contained in this **Section 1.08** or elsewhere in this Agreement shall constitute an agreement by Buyer to waive its right to insist on Seller's obtaining all required consents prior to Closing.

    **Section 1.09   Cash Holdback.**

        (a)     Notwithstanding the inclusion of all of the Seller's cash and cash equivalents in Purchased Assets, the Buyer agrees that the lesser of Three Hundred Thousand Dollars ($300,000) or the Seller's cash on hand as of the Closing Date (the "**Cash Holdback**") shall remain in the Seller's Debtor-in-Possession account at PNC Bank, subject to an administrative hold by PNC Bank.  The Cash Holdback shall be available for the payment of any administrative expenses either (a) incurred by the Debtor the ordinary course of its business between the Petition Date and the Closing Date and due and payable prior to the Closing Date in accordance with the Seller's 13 week cash flow budget submitted to PNC Bank; or (b) incurred by the Debtor on or after the Petition Date and allowed pursuant to Section 503 of the Bankruptcy Code by a final, non-appealable order of the Bankruptcy Court (collectively, the "**Unpaid Administrative Claims**").

        (b)     The Unpaid Administrative Claims shall not include the Agtech/ETOH Admin Claims, which are payable by the Buyer pursuant to the provisions of **Section 1.03(d)** hereof.

        (c)     Upon the receipt of any invoice for payment of an Unpaid Administrative Claim, the Debtor shall submit such invoice with appropriate supporting backup to the Buyer for approval of payment.  Buyer shall provide the Debtor and PNC Bank with either its written approval for payment (which approval shall not be unreasonably withheld) or its disapproval with an explanation therefor within two business days of receipt of any such request.  Upon receipt of any written approvals from Buyer, PNC Bank shall release the administrative hold on the Cash Holdback in an amount necessary for Seller to pay the holder of the Unpaid Administrative Claim. If Seller is no longer a debtor in possession when the Unpaid Administrative Claim is approved for payment, PNC shall transfer

sufficient funds to Buyer to pay such claim directly. Upon receipt of any written disapproval from Buyer, the holder of the Unpaid Administrative Claim at issue may either provide additional support for the payment requested, or may file a motion seeking allowance of its Unpaid Administrative Claim with the Bankruptcy Court.

(d)    Any portion of the Cash Holdback that has not been either paid on account of any Unpaid Administrative Claim or earmarked for any pending motion for allowance pursuant to Section 503 of the Bankruptcy Code as of November 1, 2021 shall be returned to Buyer.  The sum of any cash or cash equivalents transferred to the Buyer on the Closing Date, plus any unused portion of the Cash Holdback returned to the Buyer pursuant to this Section, shall be the "**Available Cash**".

(e)    In the event the Cash Holdback is not sufficient for the payment of Unpaid Administrative Claims, the Buyer shall make additional funds available for the payment of the remaining Unpaid Administrative Claims, but only to the extent of Available Cash. Promptly after all Unpaid Administrative Claims have been satisfied or otherwise resolved, Buyer shall prepare a reconciliation of the Cash Holdback and the Available Cash for review by PNC Bank to determine whether the threshold for Buyer's funding of the Carve Out has been met.

## ARTICLE II
## CLOSING

**Section 2.01    Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Seller's attorneys, Flaster Greenberg, 1835 Market Street, Philadelphia, PA at 10:00 a.m. on September 30, 2021, or at such other time or place or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 2.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a bill of sale in form and substance satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement in form and substance satisfactory to Buyer (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities other than the Tangible Personal Property, the Fee Properties or the Leased Properties;

(iii)    the deed in form and substance satisfactory to Buyer for the Fee Property (the "**Deed**");

(iv)    An assignment and assumptions of leases in form and substance satisfactory to Buyer for the Leased Properties (the "**Assignment and Assumption of Leases**");

(v)    a certificate of the Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the Board of Managers of Seller, which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale, the Deed, the Assignment and Assumption Agreement, Assignment and Assumption of Leases, and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at or after the Closing (collectively, the "**Transaction Documents**") and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Transaction Documents;

(vi)    such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement;

(vii)    all affidavits, indemnities, proof of authority, due authorization, and other deliveries requested by the Title Company, as hereinafter defined, to insure title as required by this Agreement;

(viii)    one or more closing statements evidencing the transfer and use of funds applicable to Closing;

(ix)    the Bid Procedures Order and the Sale Order, in the form required by Article VIII hereof and acceptable to the Title Company, as hereinafter defined; and

(x)    such other documents and deliveries as are reasonably necessary to complete Closing.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Purchase Price (less any amounts which may be withheld for outstanding Tax Liabilities);

(ii)    the Assignment and Assumption Agreement duly executed by Buyer;

(iii)    the Assignment and Assumption of Leases duly executed by Buyer;

(iv)    one or more closing statements evidencing the transfer and use of funds applicable to Closing; and

(v)    such other documents and deliveries as are reasonably necessary to complete Closing.

**Section 2.03    Assigned Contracts.** The Sale Motion (as defined herein) shall request approval of the assumption and assignment by the Seller to the Buyer of all Assigned Contracts

and shall identify all amounts that the Seller believes are necessary to cure any pre-Closing defaults by the Seller on all Assigned Contracts (the "**Cure Amounts**"), which shall be paid by Buyer at Closing.

### Section 2.04    Prorations.

(a)Except to the extent included in Assumed Liabilities, all real property taxes, personal property taxes, assessments, ad valorem taxes, rent, prepaid rent, prepaid expenses, and other customarily pro ratable items relating to the Purchased Assets relating to a period of time both prior to and subsequent to the Closing Date, will be prorated as of the Closing Date between Buyer and Seller, as applicable, in the customary manner of asset sales in Bucks County, Pennsylvania, and will be deducted from or added to the amount to be paid by the Buyer at Closing.

(b)      Each of Buyer and Seller shall pay one-half of all realty transfer taxes due by reason of the transfers contemplated by this Agreement.  Any and all other transfer and sales taxes and fees, if any, payable with respect to the transfer of the Purchased Assets shall be paid by the party required by law to pay such taxes and fees.

### Section 2.05    Closing Expenses. Except as otherwise specifically provided herein, each of Buyer and Seller shall pay the costs of their respective attorneys for the transactions contemplated by this Agreement.  Buyer shall pay the costs for recording of the release of the mortgage in favor of PNC Bank, N.A. from the Fee Property and the assumption of the mortgage in favor of Francis E. Stubbs and Maria Del Carmen Nuno.  Buyer shall pay the recording costs for the recording of the deed, the title insurance premium costs for any title insurance policy obtained by Buyer and for all endorsements thereto.  Any other closing costs shall be allocated in accordance with local custom.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the date hereof.  Except as expressly set forth herein, Seller is selling the Purchased Assets AS IS, WHERE IS:

### Section 3.01    Organization and Authority of Seller. Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of the Commonwealth of Pennsylvania. Seller has full power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, board, and member action on the part of Seller. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

**Section 3.02   No Conflicts or Consents.** The execution, delivery, and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of organization, operating agreement or other governing documents of Seller; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller, the Business, or the Purchased Assets; (c) except for the Bankruptcy Court approvals referenced in Article VIII hereof, require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("**Person**") or require any permit, license, or Governmental Order; (d) violate or conflict with or result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets.

**Section 3.03   Financial Statements.** If requested by the Buyer in writing, complete copies of the financial statements consisting of the balance sheet of the Business as at December 31, 2020 and the related statements of income and retained earnings, shareholders' equity, and cash flow for the years then ended 2020 (the "**Financial Statements**") shall be delivered to Buyer. Such Financial Statements shall fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated. The balance sheet of the Business as of December 31, 2020 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**."

**Section 3.04   Undisclosed Liabilities.** Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date or set forth on **Schedule 3.04** of the Disclosure Schedules or in schedules filed with the Bankruptcy Court in the Case, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.05   Assigned Contracts.** To the Seller's knowledge, each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither Seller nor, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Assigned Contract. Except as disclosed on **Schedule 3.05** of the Disclosure Schedules or in schedules filed with the Bankruptcy Court in the Bankruptcy Case, no event or circumstance has occurred that would constitute an event of default under any Assigned Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Assigned Contract.

**Section 3.06    Title to Purchased Assets.** Except as set forth in **Schedule 3.06** of the Disclosure Schedules (the "**Permitted Exceptions**") and except such liens as shall be released from the Purchased Assets in accordance with the Sale Order, Seller and/or Seller Subs have good and valid title to all of the Purchased Assets, free and clear of Liens and Interests.

**Section 3.07    Legal Proceedings; Governmental Orders.**

(a)    Except as set forth in **Schedule 3.07** of the Disclosure Schedules or in filings in the Bankruptcy Case, there are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or, to Seller's knowledge, threatened against or by Seller: (i) relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)    Except as may have been issued in the Bankruptcy Case, there are no outstanding Governmental Orders against, relating to, or affecting the Business or the Purchased Assets.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article  are true and correct as of the date hereof.

**Section 4.01    Organization and Authority of Buyer.** Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Delaware.  Buyer is not an "insider" of the Seller, as defined under the Bankruptcy Code. Buyer has full power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.  In accordance with the terms of the Bid Procedures Order, (i) the Buyer (a) has had an opportunity to conduct due diligence regarding the Assets, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its bid, (c) did not rely upon any written or oral statements, representation, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale, and (d) has not entered into any agreement with any other potential bidder concerning the Auction or the Sale or disclosed any agreement with any other potential bidder concerning the Auction or Sale;  (ii) this Agreement is not subject to

contingencies of any kind, including, without limitation, contingencies related to financing, due diligence or third party, regulatory or internal approval; and (iii) Buyer as obtained all required internal corporate, legal and other authorizations to close that transactions contemplated by this Agreement and to provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code.

**Section 4.02   No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of organization, operating agreement, or other organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 4.03   Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.04   Financial Wherewithal.**   Buyer has the financial wherewithal to consummate the transactions contemplated by this Agreement.

# ARTICLE V
# COVENANTS

**Section 5.01   Receivables.** From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Buyer within five (5) business days after its receipt thereof. From and after the Closing, if Buyer or its Affiliate receives or collects any funds relating to any Excluded Asset, Buyer or its Affiliate shall remit any such funds to Seller within five (5) business days after its receipt thereof.

**Section 5.02   Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 5.03   Bulk Sales.**  At or about the time of Closing, the Purchased Assets may constitute 51% or more of Seller's remaining real property or 51% or more of Seller's property in the Commonwealth of Pennsylvania thereby requiring the Seller to comply with one or more of Pennsylvania's "bulk sales clearance" statutes (43 P.S. § 788.3; 69 P.S. § 529, 72 P.S. § 7240; 72 P.S. § 7321.1 and/or any similar law) (the "**Bulk Sales Laws**").  To the extent the sale of the Purchased Assets, or any portion thereof, requires Seller to obtain a clearance certificate in order to prevent Buyer from being liable for any taxes imposed upon Seller, Seller shall (a) at least 30 days prior to Closing, provide Buyer with a letter from an independent certified public accountant addressed to Buyer which includes an estimate of Seller's tax liability under the Bulk Sales Laws

through the Closing Date, including taxes incurred with respect to or as a result of the sale of the Property (such estimated tax liability being hereinafter referred to as the "**Estimated Tax Liability**"), (b) file all forms and make all submissions required by the Bulk Sales Laws in a timely manner and (c) at Closing, a portion of the Purchase Price equal to 150% of the Estimated Tax Liability shall be placed in escrow pending Seller's obtaining of the required clearance certificates from the Pennsylvania Department of Revenue as necessary to release Buyer from any liability with respect to the Bulk Sales Laws in connection with Buyer's acquisition of the Purchased Assets (the "**Clearance Certificates**").  Seller shall indemnify, defend and hold Buyer harmless of and from any liability (including, but not limited to, court costs and attorney's fees) which might be imposed on Buyer or its successors or assigns by reason of Seller's failure to pay any tax imposed on Seller.  This **Section 5.03** shall survive Closing.

**Section 5.04    Liquor Licenses; Transition Date; Post-Closing Contracts.**

(a)    Buyer has the necessary liquor licenses to permit Buyer to take possession of the Purchased Assets. Buyer has applied for an additional distillery license to cover the Real Property.

(b)    After the date hereof, Buyer shall have the right to enter into contracts to becoming effective after closing (the "**Post-Closing Contracts**") that will allow Buyer to obtain supplies and equipment and provide products and services using the Purchased Assets.

(c)    Buyer intends, but shall not be obligated, to hire all or a substantial portion of the Seller's existing employees to operate Buyer's business.

(d)    This Section 5.04 shall survive Closing.

**Section 5.05    Continued Performance; Payment of Trade Payables.**  Between the date of this Agreement and Closing, Seller has and shall (i) continue to operate the Seller; (ii) collect accounts receivable and pay accounts payable in the ordinary course of business, including, without limitation, those amounts owed to Scott Laboratories under Invoice Nos. SIV320578 and SIV324630; (iii) use reasonable best efforts to maintain and preserve intact the current business and to preserve the rights, franchises, goodwill and relationships of the Seller's employees, customers, lenders, suppliers, regulators and others having business relationships with the Seller; and (iv) maintain the Purchased Assets in the same condition as they were on the date of this Agreement.

**Section 5.06    Employees.** For the purposes of transitioning the Business, upon the entry of the Sale Order (as hereinafter defined) by the Bankruptcy Court, Seller shall provide Buyer a list of Seller's employees and independent contractors, including their roles and salaries/pay rates. During the period between the entry of the Sale Order  and the Closing, Seller shall permit Buyer or representatives of the Buyer (including, but not limited to, third party service providers) to have access, at reasonable times and with reasonable notice, to meet with the employees of the Seller, the Seller Subs and the Business. Notwithstanding the foregoing, Buyer shall be under no obligation of any kind to offer employment to any or all of such employees. For the avoidance of doubt, nothing in this Section 5.06 shall be deemed to create an additional condition to Buyer's

obligations under Article VI of this Agreement other than Seller's failure to provide the information required hereby.  Further, nothing in this Section 5.06 shall be deemed to amend Article III which provides that the Seller is selling the Purchased Assets AS IS, WHERE IS.

Section 5.07  **Vendor List.** At Closing, Seller shall deliver to the Buyer a true, correct and complete list of any agreement, contract, statement of work, service order or purchase order for the purchase of raw materials, commodities, supplies, products, or other personnel property, or for the receipt of services, any of the foregoing which pertains to the Seller, the Seller Subs or the Business. For the avoidance of doubt, nothing in this Section 5.07 shall be deemed to create an additional condition to Buyer's obligations under Article VI of this Agreement other than Seller's failure to provide the information required hereby.  Further, nothing in this Section 5.07 shall be deemed to amend Article III which provides that the Seller is selling the Purchased Assets AS IS, WHERE IS.

Section 5.08  **Intellectual Property**. Seller shall prepare and deliver to Buyer at Closing, a true, correct and complete list of the following as they exist in any jurisdiction throughout the world: (i) United States and foreign patents, patent applications, continuations, continuations-in-part, divisions or reissues; (ii) United States federal, state and foreign trademarks, service marks, and trade names, pending applications to register the foregoing, and common law trademarks, service marks and trademarks, designs, logos, and other designations of origin and goodwill associated therewith; (iii) trade secrets, and other confidential and proprietary business information, such as methods, processes, specifications, product formulas, blending formulas and recipes, any TTB approved formulas reports, customer lists, mailing lists, business plans; (v) all registered domain names; and (vi) proprietary computer software, including all source code, object code, and documentation related thereto.  Further, nothing in this Section 5.08 shall be deemed to amend Article III which provides that the Seller is selling the Purchased Assets AS IS, WHERE IS."

## ARTICLE VI
## CONDITIONS TO BUYER'S OBLIGATIONS.

The obligation of Buyer to purchase the Purchased Assets from Seller and to consummate the other transactions contemplated hereby is subject to the satisfaction, on or before the Closing Date, of the following conditions, each of which may be waived by the Buyer in its sole discretion:

Section 6.01  **Consents.** All requisite governmental approvals and consents of third parties identified on **Schedule 6.01** and the Bankruptcy Court Approvals referenced in **Section 8.02** below shall have been obtained.  Further, if any consents are required for the assignments of any Contracts, leases, loans or other Purchased Assets or Assumed Obligations, all such consents shall have been obtained.

Section 6.02  **Representations and Warranties Accurate.** All of the representations and warranties of the Seller contained in this Agreement or referred to herein or delivered pursuant hereto or in connection with the transactions contemplated hereby shall be true, correct and complete in all material respects on and as of the Effective Date and on and as of the Closing Date, as if made on and as of the Closing Date.  On the Closing Date, the Seller shall have executed and

delivered to the Buyer a certificate, in form and substance satisfactory to the Buyer and its counsel, to such effect.

**Section 6.03   Performance**.    The Seller shall have performed and complied in all material respects with all covenants and agreements contained herein required to be performed or complied with by it prior to or at the Closing Date.

**Section 6.04   No Actions, Suits or Proceedings**.  As of the Closing Date, no order, decree or judgment of any court or governmental body shall have been issued restraining, prohibiting, restricting or delaying, the consummation of the transactions contemplated by this Agreement.

**Section 6.05   Closing Deliveries**.  The Seller shall have delivered all of the deliveries required by **Section 2.02(a)** hereof.

**Section 6.06   Bankruptcy Court Approval**.  The Bankruptcy Court shall have issued orders pursuant to the provisions of Article VIII hereof.

**Section 6.07   Title Insurance.**  The title company selected by Buyer and licensed to do business in Pennsylvania (the "**Title Company**") shall be prepared to insure title to the Fee Property free and clear of all Liens and Interests except for the Assumed Liabilities and the Permitted Exceptions.

## ARTICLE VII
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to transfer the Purchased Assets to the Buyer and to consummate the other transactions contemplated hereby is subject to the satisfaction, on or before the Closing Date, of the following conditions, each of which may be waived by the Seller in its sole discretion:

**Section 7.01   Representations and Warranties to be True and Correct**.  All of the representations and warranties of Buyer contained in this Agreement attached hereto or referred to herein or delivered pursuant hereto or in connection with the transactions contemplated hereby shall be true, correct and complete in all material respects on and as of the Effective Date and on and as of the Closing Date, as if made on and as of the Closing Date.

**Section 7.02   Performance**.  Buyer shall have performed and complied in all material respects with all covenants and agreements contained herein required to be performed or complied with by it prior to or at the Closing Date.

**Section 7.03   No Actions, Suits or Proceedings**.  No order, decree or judgment of any court or governmental body shall have been issued restraining, prohibiting, restricting or delaying, the consummation of the transactions contemplated by this Agreement.  No insolvency proceeding of any character including without limitation, bankruptcy, receivership, reorganization, dissolution or arrangement with creditors, voluntary or involuntary, affecting Buyer shall be pending, and Buyer shall not have taken any action in contemplation of, or which would constitute the basis for, the institution of any such proceedings.

**Section 7.04   Closing Deliveries**.  Buyer shall have delivered the Purchase Price and all of the other deliveries required by **Section 2.02(b)** hereof.

**Section 7.05   Bankruptcy Court Approval**.  The Bankruptcy Court shall have issued orders pursuant to the provisions of Article VIII.

## ARTICLE VIII
## BANKRUPTCY COURT APPROVALS

**Section 8.01   Bankruptcy Bidding Procedures**.  The Seller filed a motion with the Bankruptcy Court (the "**Bid Procedures Motion**") and obtained an order (the "**Bid Procedures Order**") by the Bankruptcy Court.

**Section 8.02   Bankruptcy Court Approvals**.  The Seller filed a motion with the Bankruptcy Court (the "**Sale Motion**") seeking the entry of an order satisfactory to the Buyer in its reasonable discretion approving the sale contemplated by this Agreement (the "**Sale Order**") which sale shall be free and clear of all Liens and Interests, as hereinafter defined. Without limiting the generality of the foregoing, the motion shall seek the entry of a Final Order finding and providing that (i) title to the Purchased Assets shall be transferred to the Buyer free and clear of all liens, mortgages, security interests, encumbrances, rights, liabilities, claims, counterclaims, setoffs, and all  other interests, other than the Assumed Liabilities, whether arising before or after the date the first petition in the Bankruptcy Case was filed (collectively, "**Liens and Interests**"), and that any such Liens and Interests shall attach only to the proceeds paid in connection with the transactions contemplated in this Agreement; (ii)  every person holding any Liens and Interests against the Seller or in the Purchased Assets are enjoined from enforcing such Liens and Interests against the Buyer; (iii) the Buyer is purchasing the Purchased Assets in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections offered thereby; (iv) the Agreement was negotiated, proposed, and entered into by the parties without collusion, in good faith, and after arms length bargaining; (v) the sale of the Purchased Assets is in the best interests of the Seller, its creditors, and its estate; (vi) the stay provided under the Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall be waived to the extent necessary to permit a Closing to occur promptly upon entry of the Sale Order, (vii) the Seller is authorized pursuant to section 365 of the Bankruptcy Code to assume and assign the Assigned Contracts and the Assigned Leases, (viii) intentionally omitted; (ix) Seller is authorized and directed to execute and deliver the documents set forth in this Agreement, including, without limitation, the deliveries set forth in Section 2.02(a) hereof; and (ix) the Bankruptcy Court retaining jurisdiction to enforce the Sale Order. The Sale Motion, the Sale Order, the Bid Procedures Motion, and the Bid Procedures Order, as well as all other documents filed with the Bankruptcy Court related to the Proposed Transaction, must be satisfactory to the Buyer in its reasonable discretion. Service of the Sale Notice shall be completed in a manner satisfactory to the Buyer in its reasonable discretion.

**Section 8.03   Integral Part of Transaction**.  Seller acknowledges the agreements contained in this Article VIII are an integral part of the transaction contemplated hereby and that, without these agreements, Buyer would not enter into this Agreement. The provisions of this Article VIII shall survive the closing or earlier termination of the transactions contemplated hereby.

## ARTICLE IX
## INDEMNIFICATION

**Section 9.01    Survival.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 9.02    Indemnification by Seller.** Subject to the other terms and conditions of this Article IX, Seller shall indemnify and defend each of Buyer and its Affiliates (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees (collectively, "**Losses**"), incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or with respect to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)    any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto;

(c)    any Excluded Asset or any Excluded Liability; or

(d)    any Third Party Claim based upon, resulting from, or arising out of the business, operations, properties, assets, or obligations of Seller or any of its Affiliates (other than the Purchased Assets or Assumed Liabilities) conducted, existing, or arising on or prior to the Closing Date. For purposes of this Agreement, "**Third Party Claim**" means notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing.

**Section 9.03    Indemnification by Buyer.** Subject to the other terms and conditions of this Article 9, Buyer shall indemnify and defend each of Seller and its Affiliates (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, or with respect to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)    any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement; or

(c)    any Assumed Liability.

**Section 9.04    Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed). All of the provisions of this Section 9.04 shall be subject to Bankruptcy Court approval if applicable; provided, however, that approval of this Agreement by the Bankruptcy Court in the Sale Order shall be sufficient approval to satisfy this Section 9.04.

**Section 9.05    Cumulative Remedies.** The rights and remedies provided in this Article are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

## ARTICLE X   TERMINATION

**Section 10.01 Termination** This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)    By mutual written consent duly authorized by the Seller and the Buyer;

(b)    By Buyer by notice to Seller if:

(i)    any court of competent jurisdiction or other governmental body shall have issued an order, decree or ruling, or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby;

(ii)    the Closing has not occurred on or prior to September 30, 2021 (the "**Outside Closing Date**"), for any reason other than the breach of any provision of this Agreement by the party terminating this Agreement;

(iii)    Seller materially breaches any of its representations, warranties or covenants set forth in this Agreement and fails to cure such breach within ten (10) days after the date of notice of such breach;

(iv)    Unless Buyer agrees otherwise in writing, the Bankruptcy Court has not entered the Sale Order as of September 20, 2021;

(v)    any of the conditions set forth in Article VI hereof have not been satisfied on or before the Outside Closing Date, or shall have become incapable of fulfillment and shall not have been waived by the party entitled to the benefit of such condition; or

(c)    By Seller by notice to Buyer if:

(i)    any court of competent jurisdiction or other governmental body shall have issued an order, decree or ruling, or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby, provided that this Agreement shall not be terminated pursuant to this paragraph unless Seller has utilized its reasonable best efforts to oppose the issuance of such order, decree or ruling or the taking of such action;

(ii)    Buyer materially breaches any of its representations, warranties or covenants attached hereto that result in Closing failing to occur under this Agreement, and Buyer fails to cure such breach within ten (10) days after the date of notice of such breach; or

(iii)    Pursuant to the bid procedures set forth in the Bid Procedures Order, a purchaser other than Buyer bids an amount that, with all components considered, is determined by Order of the Bankruptcy Court to be higher and better than Buyer's final bid.

No failure to terminate this Agreement by a party with the right to do so shall be deemed a waiver of the right to terminate; provided, however, that a party's right to terminate shall cease if the circumstances giving rise to the right to terminate this Agreement is of a nature other than that set forth in clause (b)(iii) or (c)(ii) and the circumstances shall cease prior to a party's notice that it has elected to terminate this Agreement.

**Section 10.02 Effect of Termination**.  In the event of the termination and abandonment of this Agreement pursuant to **Section 10.01**, this Agreement shall forthwith become void and be of no effect, without any liability on the part of any party or its directors, officers or shareholders except for the terms that expressly survive such termination.  Nothing in this **Section 10.02** shall relieve any party to this Agreement of liability for breach of this Agreement.  In the event of Termination by the Buyer pursuant to Section **10.01(b),** the Deposit shall be returned to the Buyer.

## ARTICLE XI  DEFAULT; REMEDIES

**Section 11.01 Seller Defaults**.  If a Seller breaches any of the terms, covenants or conditions of  this Agreement prior to Closing (and Buyer shall not be in default hereunder), after Buyer has given Seller not less than ten (10) days written notice of such default and if such default remains uncured after such notice period, or if any representation of Seller contained in this Agreement shall be materially false or misleading, Buyer may, as Buyer's sole and exclusive remedy hereunder, by reason of Seller's breach or default, either (i) terminate this Agreement and receive the return of the Deposit, which termination and return shall except as otherwise provided hereunder, operate to release Seller and Buyer from any and all liability hereunder, or (ii) require specific performance of Seller's obligations under this Agreement. Notwithstanding anything to the contrary set forth in this Agreement, if Seller's breach of this Agreement results from Seller's willful and intentional default under any of the terms, covenants, or conditions of this Agreement or if Buyer has a claim by reason of any misrepresentation of Seller that is not discovered by or disclosed to Buyer until after Closing, Buyer shall be entitled to pursue any and all of such remedies as may be available at law or in equity against the Seller.

**Section 11.02 Buyer Defaults**.  In the event Closing does not occur by reason of a Buyer Default (defined below), then the retention of the Deposit shall be Seller's sole and exclusive remedy under this covenant, subject to the provisions of this covenant that expressly survive Closing or a termination of this covenant.  In connection with the foregoing, the parties recognize that Seller will incur expense in connection with the transaction contemplated by this covenant; further, that it is extremely difficult and impracticable to ascertain the extent of detriment to Seller caused by a Buyer Default and the failure of the consummation of the transaction contemplated by this covenant or the amount of compensation Seller should receive as a result of Buyer's Default. It shall be a default by Buyer under this Agreement (a "**Buyer's Default**") if any one or more of the following shall occur:

        (a)      Buyer shall fail to pay the Deposit or the amounts to be paid at Closing; or

        (b)      Buyer shall have made any misrepresentation or breach of warranty, or shall have failed to perform any of its other covenants and agreements contained in this Agreement when required to be performed hereunder which misrepresentation, breach or failure shall result in Buyer's inability or unwillingness to complete Closing on the terms and conditions set forth herein, and such misrepresentation, breach or failure shall continue for ten (10) days after Seller gives Buyer written notice of such misrepresentation, breach or failure; it being agreed that if a failure to perform occurs within ten (10) days prior to or on the Closing Date, the Closing Date shall be extended for no more than ten (10) days from the date of Buyer's Default as required to allow the cure to occur before Closing.

**Section 11.03 Disposition of Purchase Price Deposit**.  In the event Closing occurs, the Deposit, including interest thereon, if any, shall be delivered to Seller and applied as a partial payment of the Purchase Price.  In the event the transaction does not close, the Deposit and any interest thereon shall be delivered to the Buyer unless the failure to close arises by reason of Buyer's default as set forth in **Section 11.02**, in which case the Deposit shall be disposed of as set forth in **Section 11.02** hereof. This Section 11.03 shall survive termination of this Agreement.

## ARTICLE XII  MISCELLANEOUS

**Section 12.01  Reserved.**

**Section 12.02  Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 12.02**):

|  |  |
|---|---|
| **If to Seller:** | 118 N. Main Street |
|  | Trumbauersville Borough |
|  | Bucks County, Pennsylvania 18970 |
|  | Email: casey@theoandopp.com |
|  | Attention: Casey Parzych |
|  |  |
| with a copy to: | Flaster/Greenberg P.C. |
|  | 1835 Market Street, Suite 1050 |
|  | Philadelphia , PA 19103 |
|  | Facsimile: (215)-279-9394 |
|  | Email: William.Burnett@flastergreenberg.com |
|  | Attention: William J. Burnett, Esquire |
|  |  |
| **If to Buyer:** | 1431 N. Cadwallader Street |
|  | Philadelphia, PA 19122 |
|  | Email: robert.cassell@newlibertydistillery.com |
|  | Attention: Robert Cassell |
|  |  |
| with a copy to: | Miles & Stockbridge P.C. |
|  | 100 Light Street |
|  | Baltimore, Maryland 21202 |
|  | Email: pjefferson@milesstockbridge.com |
|  | Attention: Patricia B. Jefferson |

**Section 12.03  Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 12.04  Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 12.05 Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits, and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 12.06 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that Buyer shall have the right to assign this Agreement to any person with whom Buyer is affiliated so long as Buyer or such affiliate indemnifies Seller for any transfer taxes by reason of such assignment. Any purported assignment in violation of this **Section 12.06** shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 12.07 Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 12.08 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)     All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Pennsylvania or any other jurisdiction). Any legal suit, action, proceeding, or dispute arising out of or related to this Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby may be instituted in the federal courts of the Eastern District of the United States of America or the courts of the Commonwealth of Pennsylvania with jurisdiction over Bucks County, Pennsylvania, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, proceeding, or dispute.  Notwithstanding anything to the contrary contained herein, while the Bankruptcy Case is pending in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania, if such court will accept jurisdiction, each party irrevocably submits to the exclusive jurisdiction of such court in any such suit, action, proceeding, or dispute.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY

APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (II) EACH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) EACH PARTY MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY; AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 12.09 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

MIDNIGHT MADNESS DISTILLING, LLC,
a Pennsylvania limited liability company

By_____
Name:
Title:

SPLINT, LLC, a Pennsylvania limited
liability company

By_____
Name:
Title:

BRACE, LLC, a Pennsylvania limited
liability company

By_____
Name:
Title:

CANE, LLC, a Pennsylvania limited liability
company

By_____
Name:
Title:

CRUTCH, LLC, a Pennsylvania limited
liability company

By_____
Name:
Title:

WALKER, LLC, a Pennsylvania limited
liability company

By_____
Name:
Title:

SPECTRE DISTRIBUTING, LLC., a
Delaware limited liability company

By_____
Name:
Title:

MILLSTONE SPIRITS GROUP, LLC

By_____
Name: Robert J. Cassell
Title: Director

By _____
Name: Thomas F. Jensen
Title: Director

By _____
Name: Francis J. Maher
Title:  Director

## Schedules

**Schedule 1.01** – Assigned Contracts

**Schedule 1.02 of the Disclosure Schedules** – Excluded Assets

**Schedule 1.03 of the Disclosure Schedules** – Assumed Liabilities

**Schedule 1.06 of the Disclosure Schedules** – Allocation Schedule

**Schedule 3.04 of the Disclosure Schedules** – Liabilities Not Included in Financial Statements or Scheduled to Bankruptcy Petition

**Schedule 3.05 of the Disclosure Schedules** – Defaults under Assigned Contracts

**Schedule 3.06 of the Disclosure Schedules** – Permitted Exceptions

**Schedule 3.07 of the Disclosure Schedules** – Actions/Legal Proceedings/Governmental Orders

**Schedule 6.01** – Required Consents

**Schedule 1.01**

Assigned Contracts Known as of the Effective Date

| Contract Type | Name (and, if available, address) of Contracting Party |
|---|---|
| 1. | [Omitted] |
| 2. Xerox and printing services agreement | Altek Business Systems, Inc. 300 Emien Way Telford, PA 18969 |
| 3. Packaging Agreement | Church Street Beverage LLC |
| 4. Mitsubishi Forklift | De Lage Landen Financial Services 1111 Old Eagle School Road Wayne, PA 19087 |
| 5. | [Omitted] |
| 6. Warehouse Lease 2300 Trumbauersville Rd. Quakertown PA | Finland Leasing 2300 Trumbauersville Road Quakertown, PA 18951 |
| 7. Referral and packaging agreement | Iron Heart Canning Company, LLC 7130 Golden Ring Road Essex, MD 21221 |
| 8. 2018 Isuzu FTR - 54DK6S162.JSG017 44 and other equipment | Isuzu Finance of America 2500 Westchester Avenue, Suite 312 Purchase, NY 10577-2578 |
| 9. | [Omitted] |
| 10. Packaging Agreement | Merican Mule LLC 150 The Promenade N Long Beach, CA 90802 |
| 11. Warehouse Lease for 300 Commerce Blvd, Quakertown, PA

month-to-month | Milford Business Centre LP 2641 Township Line Road Quakertown, PA 18951 |
| 12. | [Omitted] |

| Contract Type | Name (and, if available, address) of Contracting Party |
|---|---|
| 13. | [Omitted] |
| 14.  Packaging Agreement | SmuttyNose Brewing Company |

## DISCLOSURE SCHEDULES

### Schedule 1.02 of the Disclosure Schedules

Excluded Assets

1.      Liquor licenses;
2.      All Contracts, and leases of real or personal property except for the Assigned Contracts.
3.      Seller's interest in the Seller Subs (provided for the avoidance of doubt, than any assets transferred pursuant to Section 1.01(m) of the Agreement shall not be deemed Excluded Assets).

Schedule 1(b) of the Disclosure Schedules

Assumed Liabilities

1. The Assigned Contracts;
2. The following secured claims:

| Name of Creditor | Type of Debt | Amount of Claim as of Date of Asset Purchase Agreement |
|---|---|---|
| Ally | Equipment Financing secured by Purchase Money Security Interest; 2015 Hino 195-JHHRDM2H6FK002044 | $22,883.49 |
| Ally | Equipment Financing Secured by Purchase Money Security Interest; 2015 Hino 195-JHHRDM2H7FK002022 | $8,247.00 |
| Francis E. Stubbs and Maria Del Carmen Nino | Mortgage Loan | $301,279 |
| Honda Finance | Equipment Financing Secured by Purchase Money Security Interest; 2017 Honda Ridgeline | $13,273 |
| Isuzu Finance of America | Equipment Financing Secured by Purchase Money Security Interest; 2019 Hino 195 – JHHRDM2H3KK007602 | $41,168 |
| PACCAR Financial | Equipment Financing Secured by Purchase Money Security Interest - 2017 Kenworth 370 – 3BKJHM7X6HF581594 | $22,078 |
| PACCAR Financial | Equipment Financing Secured by Purchase Money Security Interest - 2017 Kenworth T370 – 2NKHHM7X2JM214870 | $44,418 |
| Toyota Industries Commercial Finance | Equipment Financing Secured by Purchase Money Security Interest 2018 Hino 195 - JHHRDM2H2JK005192 | $15,078 |
| United States of America, on behalf of the Alcohol, Tobacco, Tax and Trade Bureau | Federal Excise Tax pursuant to 26 U.S.C. §§ 5001 et seq., secured by lien on distilled spirits inventory. | Unknown- to be determined at time distilled spirits inventory leaves bonded premises and Buyer files required returns. |

**Schedule 1.06 of the Disclosure Schedules**
Allocation Schedule


[TO  BE ATTACHED}

**Schedule 3.04 of the Disclosure Schedules**

Liabilities Not Included in Financial Statements or Scheduled to Bankruptcy Petition

None

### Schedule 3.05 of the Disclosure Schedules

Defaults under Assigned Contracts

[To Be Attached]

**Schedule 3.06 of the Disclosure Schedules**

Permitted Exceptions

The following, to the extent still extant and enforceable, it being understood that this schedule is not intended to revive any interest that has been extinguished:

Real Property:

118 N. Main Street, Trumbauersville, PA:

       i.     Mortgage and Security Agreement in the original principal amount of $400,000 from Mortgagor: Midnight Madness Distilling, LLC, in favor of Mortgagee: Francis E. Stubbs and Maria Del Carmen Nuno, dated 10/12/2016 and Recorded 10/18/2016 in Instrument # 2016064731.

       ii.     Rights granted to Trumbauersville Real Estate Co., by Right of Way as set forth in Deed Book 361, Page 296.

       iii.     Rights granted to Trumbauersville Real Estate Co., by Right of Way as set forth 916, Page 89.

       iv.     Rights granted to Trumbauersville Fire Co. No. 1 as set forth in Deed Book 671, Page 370.

       v.     Agreement by and between Julius Lehmann and Electro Mechanical Instrument Company, Inc., which includes terms and provisions as set forth in Deed Book 2095, Page 920.

       vi.     Rights, rights of way and reservations as set forth in Deed Book 1879, Page 233.

       vii.     Development Agreement by and between Borough of Trumbauersville and Midnight Madness Distilling, LLC., Finland Leasing and Hendricks Investment Associates which includes terms and conditions as set forth in Instrument No: 2018047152.

       viii.     All matters disclosed on that Plans of Subdivision as set forth in Plan Book 309, Page 61 and Instrument No: 2018047151.

**Schedule 3.06, cont.**

Permitted Exceptions

Personal Property:

| Name of Creditor | Type of Lien |
| --- | --- |
| Ally | Purchase Money Security Interest; 2015 Hino 195-JHHRDM2H6FK002044 |
| Ally | Purchase Money Security Interest; 2015 Hino 195-JHHRDM2H7FK002022 |
| Honda Finance | Purchase Money Security Interest; 2017 Honda Ridgeline |
| Isuzu Finance of America | Purchase Money Security Interest; 2019 Hino 195 – JHHRDM2H3KK007602 |
| PACCAR Financial | Purchase Money Security Interest - 2017 Kenworth 370 – 3BKJHM7X6HF581594 |
| PACCAR Financial | Purchase Money Security Interest - 2017 Kenworth T370 – 2NKHHM7X2JM214870 |
| Toyota Industries Commercial Finance | Purchase Money Security Interest 2018 Hino 195 - JHHRDM2H2JK005192 |

**Schedule 3.07 of the Disclosure Schedules**

Actions/Legal Proceedings/Governmental Orders

None

**Schedule 6.01**

Required Consents

None